## In re LLOYD'S AMERICAN TRUST FUND LITIGATION.

### No. 96 Civ. 1262 (RWS).

United States District Court,
S.D. New York.

Jan. 24, 1997.

Milberg Weiss Bershad Hynes & Lerach, New York City (David J. Bershad, Sanford P. Dumain, Regina L. LaPolla, of counsel), for Plaintiffs Gasper Celauro, Warren Peterson, Mark S. Rose, Elice J. Rose and John Norton.

Camhy Karlinsky & Stein, New York City (Kenneth A. LaPatine, Mark Budoff, of counsel), for Plaintiff Michael Montana.

Shearman & Sterling, New York City (Frederick T. Davis, Donald A. Goldsmith, Henry Weisburg, of counsel), for Defendant Citibank, N.A.

DeBevoise & Plimpton, New York City (John H. Hall, of counsel), for Defendant Citibank, N.A.

## OPINION

SWEET, District Judge.

In this consolidated action alleging breach of fiduciary duty and breach of contract and seeking damages, injunctive relief and an accounting, Defendant Citibank, N.A. ("Citibank") has moved to dismiss the complaints against it on grounds of improper forum, pursuant to Fed.R.Civ.P. 12(b)(3), failure to join an indispensable party, pursuant to Fed.

R.Civ.P. 12(b)(7), and failure to state a claim, pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons set forth below, Citibank's motion will be granted in part and denied in part.

### The Parties

Each of the named plaintiffs is a citizen and resident of the United States and seeks to represent a proposed plaintiff class of citizens for whom trust funds were to be maintained in the United States by Citibank as trustee and fiduciary (the "Plaintiffs").

The plaintiffs and proposed plaintiff class members are underwriting members of Lloyd's of London ("Lloyd's"), known as "Names." Each accepts insurance risks by participating in underwriting syndicates under various agreements described in greater detail below. Each Name is responsible solely for his or her share of any claims, and his or her assets may not be reached to satisfy the obligations of any other Name.

Citibank, a national banking association with its principal place of business in New York, is a trustee under the trust agreements described below and as a fiduciary under New York law.

### Prior Proceedings

On December 29, 1995, two of the present actions were commenced by filing of summonses and complaints in the Supreme Court of the State of New York, County of New York, captioned *Celauro v. Citibank, N.A.* (Index No. 60139/95) and *Montana v. Citibank, N.A.* (Index No. 601040/95). These actions were subsequently consolidated under the caption *In re Lloyd's American Trust Fund Litigation* (Consolidated Index No. 661039/95) by stipulation and order dated January 23, 1996. The third action, *Norton v. Citibank, N.A.* (Index No. 600692/96), was commenced in state court on February 9, 1996, and made a part of the consolidated proceedings.

On or about February 21, 1996, Citibank filed a Notice of Removal, removing the actions to this Court, predicating subject matter jurisdiction on the Edge Act, 12 U.S.C. § 632.

A motion to remand was filed by the Plaintiffs on April 6, 1996. By opinion dated June 7, 1996, the motion to remand was denied. *In re Lloyd's American Trust Fund Litigation*, 928 F.Supp. 333 (S.D.N.Y.1996).

Defendants filed the instant motion on February 22, 1996. On August 6, 1996, *Stamm v. Citibank, N.A.*, 96 Civ. 5940, was filed in this district, assigned to this Court and automatically consolidated into this litigation pursuant to the order of consolidation issued by the New York Supreme Court. After several adjournments at the request of the parties, oral argument on this motion was heard on October 2, 1996, at which time the motion was considered fully submitted.

### The Facts

The facts as set forth below are derived from the Complaint[1] and the affidavits describing the activities of the Plaintiffs, Lloyd's and Citibank, and certain of the agreements relevant to their relationships. *See Transmirra Prods. Corp. v. Fourco Glass Co.*, 246 F.2d 538, 539 (2d Cir.1957); *Bomar Resources, Inc. v. Sierra Rutile Ltd.*, No. 90 Civ. 3773, 1991 WL 4544 at *4 (S.D.N.Y. Jan. 15, 1991). In deciding the motion to dismiss for failure to state a claim, this Court considers only the facts alleged in the complaint and those documents "integral to plaintiffs claim," where plaintiffs have undisputed notice of the contents of those documents. *R.H. Damon & Co. v. Softkey Software Prods., Inc.*, 811 F.Supp. 986, 989 (S.D.N.Y.1993). Such documents include those attached to the complaint, or incorporated therein by reference. *Graal Enterprises Ltd. v. Desourdy International 1949, Inc.*, No. 95 Civ. 0752, 1996 WL 353003 at *3 (S.D.N.Y. June 26, 1996).

In sum, the Plaintiffs and the class allege that Citibank breached its duties and responsibilities as the trustee of trust funds established in Plaintiffs' names. It is alleged, *inter alia*, that Citibank engaged in a pattern of transferring money from the trust funds of solvent Names to trust funds of insolvent Names in order to meet the latters' obligations, that Citibank engaged in unautho-

---

**1.** References to the "Complaint" are to the Complaint in *Celauro v. Citibank, N.A.*, Index No. 95– 601039, originally filed in Supreme Court, New York County on December 29, 1995.

rized commingling of the funds from different trust funds, and that Citibank failed to maintain appropriate and necessary records with respect to each trust fund.

The specific allegations of improper activities include: improper loans and overdrafts; improper transfers of money; failure to establish and properly maintain separate accounts; improper investment of account funds; breaches of fiduciary duty; failure to render reports and accountings of Citibank accounts; and violations of regulations issued by the Comptroller of the Currency that specifically govern banks.

Based on these alleged breaches and wrongful conduct, the plaintiffs seek an accounting by Citibank as to each trust fund, recovery of any damages suffered as a result of Citibank's breaches of its fiduciary and contractual duties, and an injunction prohibiting Citibank from continuing to commit any breaches of the fiduciary and contractual duties owed to the plaintiffs and members of the plaintiff class.

Lloyd's is a unique and complex insurance market that has been operating in London for more than 300 years. In 1971, the Society and Corporation of Lloyd's (the "Corporation") was established by an Act of the British Parliament. The Council of Lloyd's (the "Council") is the governing body of Lloyd's, regulating activity in the Lloyd's market through the promulgation of by-laws.

Lloyd's is not itself an insurer, but a market for insurance. It is the individual underwriting members of Lloyd's, the Names, and, since 1994, a limited number of corporate members, who are the insurers and who underwrite insurance through groups called syndicates.

In 1995, nearly 15,000 individual Names from more than fifty countries were actively engaged in underwriting at Lloyd's. Of those active Names, approximately 85 percent were British subjects; five percent were American citizens on whose behalf these class actions have been brought. Since 1969 (when persons other than British subjects were first permitted to become Names), U.S. Names have accounted for approximately ten percent of a total number of Names, or more than eight percent of the Lloyd's market's aggregate premium income (the aggregate amount of gross premium income earned by all Names).

The syndicates through which Names underwrite insurance are managed by underwriting agents known as Managing Agents, to which the Names in the syndicate each delegate the authority to select risks, set premium rates, hold premiums and pay claims on their behalf. Names, in consultation with their representative at Lloyd's, who is known as a Members' Agent, select the syndicates in which they are to participate in any particular underwriting year of account. Names generally underwrite through more than one syndicate in order to diversify their risk by spreading their underwriting across different types of insurance, different syndicate managers and different currencies. Because of this diversification, most U.S. Names underwrite a substantial amount of non-U.S. business in U.S. dollars, as well as non-U.S. currency; correspondingly, non-U.S. Names underwrite a substantial amount of insurance written in U.S. dollars.

To become a member of Lloyd's, the individual Name must sign a series of standard agreements, which specify the rights and duties, and the responsibilities and liabilities, of the Name, the Managing Agents, the Members' Agents and the entire Society of Lloyd's. *See Roby v. Corporation of Lloyd's,* 996 F.2d 1353, 1358–59 (2d Cir.1993). Every Name is required to travel to London to sign these agreements. *See id.* at 1363; *Roby v. Corporation of Lloyd's,* 796 F.Supp. 103, 106 (S.D.N.Y.1992), *aff'd,* 996 F.2d 1353 (2d Cir. 1993). One key agreement is the General Undertaking. Each of the Plaintiffs has signed the General Undertaking, as well as other operative documents relating to their membership at Lloyd's. *See* Complaint ¶¶ 43–45.

The General Undertaking designates English courts as having:

> exclusive jurisdiction to settle any dispute and/or controversy of whatsoever nature arising out of or relating to the Member's membership of, and/or underwriting of insurance business at, Lloyd's and that accordingly any suit, action or proceeding

(together in this [clause] referred to as "Proceedings") arising out of or relating to such matters shall be brought in such courts and, to this end, each party hereto irrevocably agrees to submit to the jurisdiction of the courts of England and irrevocably waives any objection which it may have now or hereafter to (a) any Proceedings being brought in any such court as is referred to in this [clause] and (b) any claim that any such Proceedings have been brought in an inconvenient forum. General Undertaking ¶ 2.2.

The Members' Agent is the Name's advisor and administrator of the Name's Lloyd's affairs. It is the Members' Agent who assists the Name in selecting the syndicates the Name will join, and who helps keep the Name informed of all material developments.

Pursuant to the Agency Agreements Byelaw, the Name and his or her Members' Agent are required to execute a Members' Agent's Agreement. Pursuant to the Members' Agent's Agreement, the Name appoints the Members' Agent to act on his or her behalf, and in so doing grants the Members' Agent extensive power. In return, the Members' Agent commits to be the Name's fiduciary, and to "act in what it believes to be the interest of the Name." Members' Agent's Agreement ¶¶ 2.1; 6.2(b). The Name grants a broad power of attorney to the Members' Agent, and specifically authorizes the Members' Agent to delegate its duties to any other person. *Id.* ¶¶ 7.1(h); 7.1(i). The Name also authorizes the Members' Agent to effect the placement of the Name on the syndicates that the Name joins, and to execute an agreement with Managing Agents on the Name's behalf. *Id.* ¶ 2.2. The Members' Agent and the Name formalize their agreement as to the identity of the syndicates in which the Name will participate in any given year by signing a Syndicate List. *Id.* ¶ 3.1(a).

It is the Members' Agent's responsibility to review and report to the Name on the financial performance of the syndicates in which the Name participates. *Id.* ¶ 4(c). Furthermore, the Members' Agent must "forward to the Name all such annual reports, personal accounts and other reports

and documents received by it" from the Managing Agents of the syndicates through which the Name underwrites, and use its "best endeavors" to obtain records from the Managing Agent at the request of the Name. *Id.* ¶¶ 6.2(k), (p) and (q).

The Members' Agent's Agreement provides that "[e]ach of the parties hereby irrevocably submits for all purposes of and in connection with this Agreement to the exclusive jurisdiction of the courts of England." Members' Agent's Agreement ¶ 18.2. The Agreement also contains an arbitration clause regarding the arbitration of disputes and claims "arising under[,] out of[,] or in connection with" the Agreement. *Id.* ¶ 15.1.

After the Name, in consultation with the Members' Agent, selects the syndicates that the Name is to join, the Members' Agent enters into two standard form agreements with the Managing Agent for each syndicate. One, the "Managing Agent's Agreement," is the instrument by which the Name (or the Members' Agent acting on the Name's behalf) appoints a Managing Agent to serve as the Name's agent. The other, the Agents' Agreement, governs the relationship between the Members' Agent and the Managing Agent.

The Managing Agent's Agreement provides that the Managing Agent has fiduciary responsibilities to the Name and is responsible for the actual underwriting of risk for the Names on that Agent's syndicate. Managing Agent's Agreement ¶¶ 3(a)–(f); 4.2(b), (d)). The Managing Agent is given broad authority "to exercise on [the Name's] behalf such powers as are necessary or expedient for the provision by the Agent of the services and the performance by the Agent of the duties set out in this Agreement." *Id.* ¶ 5.

The Managing Agent is also obligated to prepare and send to the Members' Agent or the Name and to Lloyd's such annual reports, personal accounts and other reports concerning the syndicate managed by the Managing Agent as are required by the Council. Syndicate Accounting Byelaw, No. 8 of 1988 (the "Accounting Byelaw"), § 9, Schedule 4; *see also* Managing Agent's Agreement ¶ 4.2(i) (duty to disclose informa-

tion about syndicate "which could reasonably be expected to influence" Name's decision to participate in syndicate); *id.* ¶ 4.2(n)(i) (duty to maintain accounting and other records relating to syndicate); *id.* ¶ 4.2(n)(iii) (duty to provide copies of records relating to syndicate to Name, Members' Agent or professional advisers). The Managing Agent also holds a broad power of attorney from the Name. *Id.* ¶ 5(r); *see also* Members' Agent's Agreement ¶ 13.1.

Like the Members' Agent's Agreement, the Agents' Agreement and the Managing Agent's Agreement contain forum selection clauses vesting exclusive jurisdiction over any dispute in the English courts, as well as arbitration provisions. Agents' Agreement ¶¶ 9, 11.2; Managing Agent's Agreement ¶¶ 16, 19.2; *see Roby*, 996 F.2d at 1358.

Pursuant to the U.K. Insurance Companies Act of 1982, all premiums relating to a Name's underwriting must be placed into a trust fund established in accordance with the provisions of a trust deed approved by the U.K. Secretary of State for Trade and Industry. Accordingly, all premiums paid by policyholders are deposited in one of three types of Lloyd's trust funds, depending on the currency in which the premiums are paid. Lloyd's American Trust Funds (and the related American Trust Fund relating to long term business) (collectively, the "LATF") receive all premiums payable in American dollars. Lloyd's Canadian Trust Funds receive all premiums payable in Canadian dollars. All other premiums received are held in Lloyd's Premiums Trust Funds. All of the allegations of the Complaints refer to the LATF.

The Lloyd's Premiums Trust Deed ("LPTD") is signed by every Name and governs the operation of the LPTF. The LPTD provides for the establishment of the LATF and the LCTF and recognizes that the Lloyd's American Trust Deed ("LATD"), the instrument governing the LATF, has "effect in regard to the [underwriting business of the Name] and this Deed." LPTD ¶ 4(f). The LPTD also reserves to the Council the authority to amend or revise the LATD, subject to compliance with the LATD's provisions concerning revocation or amendment

and the approval of the U.K. Secretary of State for Trade and Industry. Burling Decl. ¶ 8. The LPTD contains a provision granting exclusive jurisdiction to the courts of England to resolve any and all disputes arising under the LPTD. *Id.* ¶ 25.

The LATF was created in August 1939, through an initial deposit with the City Bank Farmers Trust Company to protect policyholders in the United States from the consequences of German attacks on England. The New York Department of Insurance regulations that govern the LATF state that: "the trust fund is for the exclusive protection of all direct policyholders and beneficiaries of direct policies covering property or risks located within the United States." N.Y.Comp. Codes R. & Regs. tit. 11 vol. A, § 27.13(h)(1) (1995). The reinsurance regulations covering the LATF require the maintenance of a "trust fund ... for the protection of United States ceding insurers and United States beneficiaries under reinsurance policies." N.Y.Comp.Codes R. & Regs. tit. 11, vol. B, § 125.4(d)(1)(iv) (1995). The trust fund constitutes a vehicle to segregate certain funds to insulate them from other funds held by the Names as insurers. Citibank and its corporate predecessors have been the trustees of the LATF funds since its inception. As of January 31, 1996, Citibank held approximately $12.3 billion in LATF assets. The res of these trust funds are located within the County and State of New York. Complaint ¶ 12.

The LATF trusts operate pursuant to the terms of the Lloyd's American Trust Deed (the "LATD"). The LATD has been amended on several occasions. Plaintiffs assert that their claims are based on the LATD effective December 9, 1993. The LATD was amended by the Council of Lloyd's and signed by Citibank on December 21, 1995, and attested to by Citibank's "Senior Trust Officer" on January 6, 1996. The first complaint in these consolidated actions was filed on December 29, 1995. Plaintiffs contend that the amendment, which contains provisions that more broadly relieve the trustee from various fiduciary duties than does the earlier version, itself constitutes a bad-faith breach of Citibank's fiduciary duty to the

Names and was motivated by the impending lawsuits against Citibank. References in this opinion are to the December 9, 1993 LATD, unless otherwise indicated.

The parties to the LATD are "the Name, the Agent or Agents through which the Name underwrites ..., the Trustee hereunder acting from time to time ... and the Society of Lloyd's...." LATD ¶ 2. Article Fifth of the LATD provides that the principal of the LATF is held in trust to pay losses, claims, returns of premiums, reinsurance premiums, and other outgoings and expenses in connection with the "American business." "American business" is defined as "such part of the Name's underwriting business at Lloyd's ..." in which the Name's liability is expressed in U.S. dollars and the premiums are payable in U.S. dollars. LATD Art. First, ¶ (C).

Article Sixth states that the trust fund "shall enure for the benefit of all policy holders to whom the Name is liable in respect of the American business," and specifies the methods by which policy-holders' claims are to be established. Article Seventh states that "[s]ubject to the aforesaid trusts, the American Trust Fund shall be held in trust during the trust term for the Name...." Upon the expiration of the trust, principal and income of the trust are to be distributed to the Name.

Article Eighth of the LATD provides that the LATF is to be managed and invested by Citibank "at the direction of the Agent" and that the LATF of a given name "may be commingled with the [LATF] of any of the other Names."

Article Eleventh provides that the American Trustee will provide an accounting to the Agent and "shall not be required to account to any person other than the Agent."

The LATD contains no forum selection clause and specifies that New York law shall govern the rights of the parties with respect to the LATF. LATF Art. Eighteenth.

Plaintiffs allege that as trustee of the trust funds, Citibank owed each Name individually a fiduciary duty with respect to the monies in each Name's trust funds. ¶ 7. Many Names, particularly American Names, alleg-edly derived comfort from the fact that Citibank, a national bank that the Names knew and trusted, would be the trustee of those funds. ¶ 7.

When a Name underwrote "American Business," the profits he would eventually receive from premium payments were deposited into a trust fund for that Name to pay any claims arising under the American Business, with the remainder, after operating expenses, to be paid to the Name. ¶ 6. Because each Name is responsible only for his share of the liabilities arising from the Name's insurance underwriting on each syndicate, Plaintiffs allege that a trust fund was supposed to be established for each Name and each annual syndicate. ¶ 6. Thus, if a Name had been on ten different syndicates in 1991 and twenty different syndicates in 1992, the Name should have had thirty separate trust accounts. ¶ 6.

Plaintiffs allege that the trust instruments and Lloyd's own documents show that Citibank has authority to determine investment policies and practices. ¶ 48.

The American Trust Funds allegedly have not been administered as required by the trust deeds. ¶ 49. Instead, both are administered through combined portfolios referred to by Lloyd's as "Group Accounts," each of which is comprised of the U.S. dollar premiums of a number of individual Names and is established by the managing agent of one or more of the syndicates in which those Names participate. ¶ 49. Group Accounts may be comprised of all the Names participating in just one syndicate, just some of the Names participating in a syndicate, or may be comprised of Names from several different syndicates. ¶ 50.

Although Citibank claims it has no function other than following the instructions of employees of the Lloyd's Market Financial Services ("MFS") Department, the day-to-day administration of the LATF and LATF–LTB is handled both by a department of Lloyd's and an administrative unit within Citibank. ¶ 51.

All Names' agents (including the Members' Agent and the Managing Agent) are required to delegate their powers and authorities to

Lloyd's. ¶ 51. The agents have no control or say in the administration of the LATF, and have been unwilling or unable to provide the Names, their supposed principals, with any information concerning the Names' monies in the American Trust Funds or to direct Citibank to provide such information. ¶¶ 92–94.

When a claim made by an insured is payable, Lloyd's informs Citibank of the amount to be transferred to Lloyd's for ultimate payment to the insured. ¶ 52. Citibank transfers these amounts regardless of whether money is available in the accounts of those Names who are properly charged with such liability. ¶ 52.

When an underwriting liability is incurred, the first resort is to the funds in each member Name's trust funds to pay the liabilities. ¶ 53. If any Name does not have sufficient funds in his trust fund to meet that proportion of the claims of the policy holders for which the Name is responsible, cash calls will be issued requiring the Name to make payments to meet his liabilities. ¶ 54. If the Name fails to pay the cash calls, the sums required may be taken from the Name's "deposit" which Lloyd's holds. ¶ 55. If the funds in the Name's deposit are exhausted and the Name does not respond to cash calls, the Managing Agent may ask Lloyd's itself for money to cover the defaulting Name's liability through a draw down on Lloyd's Central Fund. ¶ 56.[2]

Plaintiffs allege that the claims payment process described above is often not followed. ¶ 59. Lloyd's and Citibank have developed a practice of treating the intermingled trust funds as a source of financing to pay syndicate liabilities without consideration as to when the liability should be charged. ¶ 60. When Names do not have sufficient monies in their trust fund accounts to meet their liabilities, Citibank takes assets from other Names' trust accounts to pay claims attributable to other trust accounts with insufficient funds. ¶ 60. In other words, pending payment of cash calls, or a draw down on the defaulting Name's deposit, or an application for cash from the CFUS I to cover the defaulter's liability, sums from the trust funds of other Names are used to pay claims for which those funds have no liability. ¶ 62.

Lloyd's allegedly admitted that this situation occurred "frequent[ly]" and in some instances, this "short term" financing has lasted as long as eighteen months. ¶ 63. Plaintiffs allege that substantial amounts of these account deficits, which Citibank and Lloyd's try to sanitize by characterizing them as loans, continue to be unpaid and uncollectible. ¶ 63. Moreover, the number of these occurrences has increased as the number of claims requiring payment has risen and more and more Names fail to meet their cash calls. ¶ 63.

When defaulting Names fail to meet cash calls, or banks refuse to allow Lloyd's to draw down the Name's letter of credit or guarantee, the monies Citibank has transferred to the insolvent accounts become uncollectible without extended litigation, which Citibank has not undertaken and, due to Citibank's failure to keep adequate records, may not be able to undertake. ¶ 64.

---

2. The Central Fund is built up from levies on Names. ¶ 56. In July 1992, Lloyd's established a Central Fund—United States ("CFUS I"), a fund which is part of the Central Fund but located in the United States, in an initial amount of $700,061,719. ¶ 57. The monies in this fund are supposed to be used to pay any default by any Name relating to insurance contracts for American Business. ¶ 57. However, any transfer of funds from the Central Fund and CFUS I are in the sole discretion of Lloyd's. ¶¶ 57, 61. Lloyd's has decided that it will not loan these funds to Names whose trusts in the LATF and LATF–LTB have impaired capital. ¶ 61. Instead, Citibank and Lloyd's have decided to use the monies in the solvent Names' trust funds to provide capital to the insolvent Names. ¶ 61.

Moreover, the great majority of the monies in the Central Fund have already been "earmarked" to pay other liabilities, and "unless decisive action is taken" the Central Fund will be exhausted in the near future. ¶ 65.

The CFUS I is under a similar strain and is facing bankruptcy. ¶ 66. The CFUS I was established in July 1992 in an initial amount of $700,061,719. ¶ 66. Less than two years later the assets in the CFUS had been almost cut in half, down to $370,162,892 as of December 31, 1993, the decrease being due to payment of claims through the LATF. ¶ 66. At this rate, the CFUS I may already be completely depleted. ¶ 66.

Plaintiffs also allege that Citibank breached its duty of loyalty by placing its own interests above those of the beneficiaries. One syndicate, a Gooda Walker syndicate, was unable to pay its insureds' claims and received "loans" from other accounts in the LATF. ¶ 104. The Gooda Walker syndicate issued a cash call to its underwriting members to repay overdrafts due to another commercial lender, repay "loans" it had received from the LATF and produce a surplus. ¶ 104. While waiting for the monies from its members, the syndicate obtained a loan from Citibank. ¶ 104. When monies were received under the cash call (which funds were not sufficient to cover all the "loans" the syndicate had received), the monies were transferred directly into a Citibank account and forwarded to repay the Citibank loan, instead of going first to repay the "loans" the syndicate had outstanding in the LATF. ¶ 104. Many of these sums allegedly remain unpaid today. ¶ 104.

A recent review by the New York State Insurance Department resulted in the discovery by New York regulators that the American Trust Fund was underfunded by at least $7.7 billion, even if the CFUS I were included as an asset available to pay liabilities relating to American Business. ¶ 67.

At the insistence of the New York State Insurance Department, Lloyd's has established an additional central fund in the United States of $500 million (the "CFUS II"). ¶ 68. However, the funds in CFUS II do not alleviate the financial crisis because the monies in the CFUS II are merely funds removed from the Central Fund and deposited in a new account. ¶ 68. Like the other funds, the use of the monies in the CFUS II remains in Lloyd's sole discretion. ¶ 68.

Citibank cannot rely on the existence of the Central Fund, the CFUS I or the CFUS II to repay these amounts that have been misappropriated from the solvent Names' trust accounts because those funds are (a) payable solely at the discretion of the Council, which has already chosen not to expend the funds to cover the shortfalls in the insolvent Names' trust accounts, and (b) nearly insolvent themselves. ¶ 69. The monies in the Central Fund, including those in the

CFUS I and CFUS II, are not sufficient to make good the defaults of the insolvent Names, let alone repay the monies that have been transferred already from the trust funds of solvent Names in the LATF to pay the liabilities of the insolvent Names. ¶ 69.

When Citibank loaned money to syndicates, which were insolvent due to the insolvency of certain Names, without the knowledge or consent of either the solvent Names or the insolvent Names, it increased the solvent Names' risk. ¶ 70. Without intersyndicate borrowing, syndicates unable to raise capital from their Names would go bankrupt. ¶ 70. Had the syndicates gone bankrupt, the Names, both in that syndicate and in the syndicates reinsuring that syndicate's risk, would have been aware of the looming liabilities so that they could have protected their assets and limited their losses by refusing to join certain syndicates and/or by refusing to continue to underwrite insurance. ¶ 70.

Moreover, as the number of Names unable to meet their liabilities increases, and these "loans" become uncollectible, solvent trust funds may become unable to meet their own liabilities when properly attributable claims are made. ¶ 71.

Inter-syndicate borrowing also may make a Name liable for claims arising in years in which he did not underwrite any insurance. ¶ 73. For instance, a Name who stopped underwriting in 1992 may in fact pay, through inter-Name borrowing, claims for losses that were incurred in 1994 through the transfer of monies from his solvent funds to those of insolvent Names. ¶ 73. The end result is that solvent Names, without any liability for these claims, are charged with paying the claims of insolvent Names, without their knowledge or consent. ¶ 74.

Lloyd's uses the American Trust Funds to satisfy its statutory duties as an accredited reinsurer and excess insurer under New York insurance law. ¶ 75. On or about May 11, 1995, the New York State Department of Insurance completed an examination of Lloyd's to determine whether Lloyd's was in compliance with Insurance Department regulations. ¶ 76. In connection with this examination, the New York State Insurance

Department reviewed various records maintained by Citibank and Lloyd's. ¶ 76. This examination revealed actions on the part of Citibank that allegedly constitute breaches of fiduciary duty. ¶¶ 76 and ff.

As noted in the report to the New York State Superintendent of Insurance:

> The examination review of various records maintained by Citibank and at Lloyd's indicates that there is not any record of the individual Names' total assets held in LATF accounts. As noted previously each Name at Lloyd's underwrites in association with other Names but each Name is underwriting for his own sole separate account. Therefore, each Name's assets in LATF is for the purpose of meeting that Name's liabilities and not liabilities of other Names. Lloyd's managing agents keep track of the amount of funds held in LATF for each syndicate under their control and also maintain records of Names comprising each syndicate. However, each Name is usually represented on several syndicates which are under the control of various managing agents. The amount of each Name's United States dollar liabilities and funds in LATF, by syndicate and managing agent, is not accumulated centrally. Further, managing agents control a Name's funds in LATF by means of group accounts. Such accounts may consist of several syndicates or Names within several syndicates grouped together for investment purposes. In order to determine each Name's assets in LATF, it would be necessary to compile a listing from each managing agent of all syndicates under the managing agent's control; such a listing would have to show a breakdown by policy year down to the Name's level. It appears that an LATF allocation by name is not maintained by the trustee or centrally by Lloyd's.

Report on Examination of Lloyd's, London as of December 31, 1993, prepared by the New York State Department of Insurance on May 11, 1995 at 11–12 (hereinafter, "Ins. Dep't Report").

The New York State Insurance Department examination went on to note:

While total assets in LATF may equal total United States dollar liabilities, an individual Name's assets in LATF may be less than the Name's United States dollar liabilities. The fact that Lloyd's does not measure the adequacy of each Name's assets in LATF in relation to each Name's United States dollar liabilities exacerbates the problem of determining compliance with Regulation Nos. 20 and 41. Therefore it appears that in order to insure proper security for all United States policyholders and United States ceding insurers Lloyd's needs to determine and be able to report each Name's assets in LATF and each Name's United States dollar liabilities or amend LATF so that assets are held on a joint and several basis.

Ins. Dep't Report at 12.

The examination by the New York State Department of Insurance also indicates that Citibank executed inter-Name and inter-syndicate borrowing that may raise a question of violation of the trust deeds:

> The examination also determined that in instances where a claim is required to be paid from LATF and there are insufficient funds in a particular group account, Lloyd's instructs Citibank to draw down on a pool of funds held in certain other group accounts, regardless of whether or not these group accounts are under the control of the same managing agent and despite the fact that a Name's funds that are drawn on may have no liability for the claim, in order to insure that the claim is settled. In effect, Lloyd's borrows one Name's assets to pay for another Name's liabilities. As LATF deed did not provide for the use of one Name's assets to pay another Name's liabilities, Lloyd's was asked to produce documentation to support this practice. Lloyd's advised that it was its United States counsel's opinion that such practice is permitted so long as it is prudent and that it will amend the LATF deeds to provide the trustee with the requisite powers. In view of the fact that certain Names are unable or unwilling to fund their Lloyd's liabilities, it is question-

able as to whether or not it is prudent to make such loans. Ins. Dep't Report at 12–13.

Moreover, the New York Insurance Department examination also showed that Lloyd's was aware that many Names were insolvent:

As a result of Lloyd's 1992 annual solvency test, Lloyd's was aware or should have been aware of the fact that its 1993 annual solvency test would indicate that assets reported in Lloyd's 1993 trusteed surplus statement to the New York Insurance Department would be inadequate to fund Lloyd's United States dollar net liabilities. As indicated previously, in September, 1994 Lloyd's earmarked 1,378,992,285 pounds to meet its 1993 solvency requirements. The earmarking amount represents a total of each Name's excess of liabilities over assets. While Lloyd's earmarked funds to cover Names' deficiencies, Lloyd's failed to transfer funds from London to correct the deficiencies in LATF and comply with the requirements of Regulation Nos. 20 and 41 (in effect as of January 1, 1994).

Ins. Dep't Report at 14.

Indeed, the New York State Department of Insurance determined that the reserves established for American Business as reported in Lloyd's 1993 Trusteed Surplus Statement were "seriously deficient" and had net deficiencies of more than $7.7 billion, or more than $18 billion before reinsurance recoveries at the end of 1993. Ins. Dep't Report at 20–24.

As a result of the Examination finding that Lloyd's was not maintaining its statutorily required minimum surplus, Lloyd's and the New York Department of Insurance entered into an agreement dated May 24, 1995. This agreement is based in part on a representation by Lloyd's that it will, under a plan of "Reconstruction and Renewal," cause the assets of the Names' trust funds relating to underwriting that occurred prior to 1993 to be transferred to Equitas, a corporation formed by Lloyd's to reinsure these risks after these risks were determined to be otherwise uninsurable. ¶ 82. These funds would then be jointly and severally liable for all claims arising under policies underwritten prior to 1993. ¶ 82. However, in the event that Equitas is unable to pay any claim, each Name would remain liable for the policies he underwrote. ¶ 82. This is simply another way to siphon the assets from the trust funds of solvent Names to pay the claims of insolvent Names. ¶ 82. As fiduciary to the solvent Names, Citibank is under a duty to preserve and protect their assets in their trust funds. ¶ 82. Under this duty, Citibank should refuse to transfer the res of the several trust funds to Equitas or any other similar entity or arrangement. ¶ 82.

After briefing, but before oral argument, further developments in Lloyd's Reconstruction and Renewal plan took place. The plan was approved by the United Kingdom Department of Trade and Industry and the New York Department of Insurance on September 3, 1996. As part of that plan, Lloyd's extended individual settlement offers to each Name. Citibank has represented that more than 90% of Names worldwide had accepted the settlement offers as of September 6, 1996. In accepting the Lloyd's settlement offer, Names irrevocably release Lloyd's and a number of entities involved in the Lloyd's market, specifically including Citibank, and grant Lloyd's a power of attorney to enter a dismissal of any complaint filed against a released party. Although it appears that one of the named plaintiffs in these cases has accepted the settlement, there has been no motion to dismiss his action. No further information on whether the other Plaintiffs in these actions have accepted the settlement has come to this Court's attention.

### Discussion

### I. *Citibank's Motion to Dismiss for Improper Venue*

Citibank moves to dismiss the complaint for improper venue, pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure, on two separate grounds. First, Citibank contends that the complaint should be dismissed pursuant to various forum selection clauses signed by the Names that designate England as the forum for resolution of disputes. Second, Citibank claims that dismissal is warranted on grounds of *forum non*

*conveniens.* For the following reasons, Citibank's motion to dismiss for improper venue is denied.

## A. *Forum Selection Clause*

██ Each of the Names signed three documents containing forum selection clauses vesting exclusive jurisdiction in the courts of England: (1) the General Undertaking, which serves as the "master gateway agreement into Lloyd's;"[3] (2) the Members' Agent Agreement, which gives effect to the Managing Agent's Agreement and the Agents' Agreement; and (3) the Premiums Trust Deed, which establishes the primary fund into which policyholders' premiums are deposited and provides for the existence of the LATF. However, the trust instruments from which this action arises and to which both Citibank and the Names are parties do not contain forum selection clauses.

Citibank contends that it is entitled to enforce the English forum selection clauses against the Names, despite the fact that Citibank is not a signatory to the clauses, because (1) it is a non-party "closely related" to the signatory Lloyd's; (2) it is an intended beneficiary of the promise the Names made in signing both the General Undertaking and the Premiums Trust Deed; (3) it is a promisee embraced within the group defined to constitute Lloyd's within the General Undertaking; and (4) the Names rely on the General Undertaking in suing Citibank. For the following reasons, Citibank is not entitled to enforce the English forum selection clauses.[4]

### 1. *Citibank Is Not "Closely Related" to Lloyd's*

Under some circumstances, federal courts have permitted a non-party "closely related"

to a signatory to enforce a forum selection clause. *See Frietsch v. Refco, Inc.,* 56 F.3d 825, 827 (7th Cir.1995); *cf. Hugel v. Corp. of Lloyd's,* 999 F.2d 206, 209–10 (7th Cir.1993) ("In order to bind a non-party to a forum selection clause, the party must be 'closely related' to the dispute such that it becomes 'foreseeable' that it will be bound."); *Manetti–Farrow, Inc. v. Gucci Am., Inc.,* 858 F.2d 509, 514 n. 5 (9th Cir.1988). Citibank contends that it should be entitled to enforce the forum selection clause because it is "closely related" to Lloyd's.

As the court in *Frietsch* observed, the phrase "closely related" is not particularly illuminating. 56 F.3d at 827. However, the phrase may be given meaningful content by reference to the principle of mutuality. *Id.* Thus, if Plaintiffs were entitled to enforce the forum selection clause against Citibank in a suit in England, Citibank should be able to enforce the clause against the Plaintiffs. If, on the other hand, Citibank is not bound by the choice of forum provided in the various agreements entered into by Plaintiffs, it should not be able to enforce the clauses against them.

Plaintiffs have submitted an affidavit of an English barrister indicating that Plaintiffs would be unable to enforce the forum selection clauses against Citibank. Citibank contends that the principle of mutuality is irrelevant where, as here, Citibank is subject to service of process and jurisdiction in England. However, the issue is not whether the English courts would have jurisdiction over Citibank, but whether the Plaintiffs could assert the forum selection clause to defeat a motion by Citibank to dismiss on grounds of

---

**3.** The "General Undertaking" provides that:

> the courts of England shall have exclusive jurisdiction to settle any dispute and/or controversy of whatsoever nature arising out of or relating to the Member's [Name's] membership of, and or underwriting of insurance business at, Lloyd's.

General Undertaking ¶ 2.2

These three agreements contain the same forum selection clause:

> Each of the parties hereby irrevocably submits for all purposes and in connection with this Agreement to the exclusive jurisdiction of the courts of England.

Members' Agents' Agreement ¶ 18.2; Agents' Agreement ¶ 11.2; Managing Agent's Agreement ¶ 19.2.

The Premiums Trust Deed provides that:

> [t]he parties hereto irrevocably and unconditionally submit for all purposes of and in connection with this Deed to the exclusive jurisdiction of the English Courts.

Premiums Trust Deed ¶ 25.

**4.** Because the Court finds that Citibank is not entitled to enforce the English forum selection clauses, the question of the forum selection clauses' enforceability need not be addressed.

*forum non conveniens.* Because Plaintiffs would be unable to do so, Citibank is not entitled to enforce the forum selection clauses here.

Citibank further argues that under New York law, the lack of mutuality in a forum selection clause does not render it unenforceable, citing *Karl Koch Erecting Co. v. New York Convention Ctr. Dev. Corp.*, 838 F.2d 656, 659–60 (2d Cir.1988). However, the question in that case was not whether a non-party to a forum selection clause should be permitted to enforce the clause against a party to the clause, but whether a non-mutual forum selection clause to which both parties expressly agreed was enforceable at all. In addition, the *Koch* court's ruling rested in part on the conclusion that the forum selection clause before the court may not have lacked mutuality. *Id.* at 660. Here, the forum selection clause does, in fact, lack mutuality.

Moreover, setting aside the question of mutuality, the cases cited by Citibank are factually distinguishable from this case. In *Frietsch* and *Hugel,* the Seventh Circuit found non-parties who controlled the signatories to be "closely related." *See Frietsch,* 56 F.3d at 827–28 (finding defendant to be "closely related" to German signatories because plaintiffs alleged that defendant entirely controlled these signatories); *Hugel,* 999 F.2d at 209–10 (upholding district court's finding that non-party corporations owned and controlled by signatory plaintiff are so closely related to the dispute that they are equally bound by the forum selection clause). The relationship between the non-party and the signatory must be sufficiently close so that the non-party's enforcement of the forum selection clause is "foreseeable" by virtue of the relationship between the signatory and the party sought to be bound. In the cases relied upon by Citibank, the defendant seeking to avoid the application of the forum selection clause owned and controlled the signatory of the forum selection clause. In the case at bar, Citibank neither controls Lloyd's, nor is Citibank sufficiently close to Lloyd's such that it would be foreseeable to Plaintiffs that Citibank would be entitled to enforce the clause.

Finally, and perhaps most significantly, this case differs from those cited by Citibank, because here the forum selection clause included in so many of the agreements prepared by Lloyd's is conspicuously absent from the LATD, the document that controls the relationship between the parties and governs this dispute. Lloyd's has amended the LATD eight times since 1939, but has chosen not to add the English forum selection clause. The inescapable inference from the fact that Lloyd's included a forum selection clause in virtually all of the documents involving the Names' relationship to Lloyd's but omitted such a clause from the LATD is that Lloyd's did not intend to compel Citibank or the Names to litigate their disputes in England. In fact, the absence of the forum selection clause suggests that Citibank itself did not want to be bound to litigate claims against it in England.

The fact that the LATD provides that New York law will apply to all claims in connection with the LATF, although not dispositive in itself, further supports Plaintiffs' argument that the English forum selection clauses in other documents should not be read into the LATD. Absent clear language to the contrary in the document in question, it is reasonable to assume that the selection of the law of a particular jurisdiction would at least permit a court of that jurisdiction to hear cases arising under that document. *Cf. Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 519 n. 13, 94 S.Ct. 2449, 2457 n. 13, 41 L.Ed.2d 270 (1974) ("[T]he designation of arbitration in a certain place might also be viewed as implicitly selecting the law of that place to apply to that transaction.")

2. *Citibank Is Not an Intended Beneficiary of the English Forum Selection Clauses*

Citibank also contends that it should be permitted to enforce the various forum selection clauses, because it is an intended beneficiary of the Names' and Lloyd's agreement to resolve disputes in England.

In determining whether a non-party to an agreement is an intended beneficiary under New York law, the Second Circuit has relied on the Restatement of Contracts. *Septem-*

*bertide Publishing, B.V. v. Stein & Day, Inc.,* 884 F.2d 675, 679 (2d Cir.1989). The Restatement provides that:

[A] beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and ... the circumstances indicated that the promisee intends to give the beneficiary the benefit of the promised performance.

Restatement (Second) of Contracts § 302 (1981).

In this case, the circumstances do not indicate that Lloyd's, the promisee, intended to give Citibank the benefit of the promised performance under either the General Undertaking or the Premiums Trust Deed. Although the LATD, which was prepared by Lloyd's, contemplates the possibility of legal action between the Names and Citibank, the American Trustee, *see* LATD Articles Tenth and Seventeenth, it lacks an English forum selection clause. As discussed above, if Lloyd's intended to provide Citibank with the benefit of the English forum selection clause, it would have so provided in the LATD, as Lloyd's so provided in all other contractual agreements.

Citibank contends that *Roby v. Corporation of Lloyd's,* 996 F.2d 1353 and *Bonny v. Society of Lloyd's,* 3 F.3d 156 (7th Cir.1993), compel a different result. In *Bonny,* the district court relied on the forum selection clause to dismiss claims against Lloyd's and also dismissed the claims against Illinois defendants who were not parties to the forum selection clause. The Seventh Circuit affirmed the dismissal of the Illinois defendants on the ground that the claims against the local defendants were "integrally related" to those against Lloyd's "such that the suit against all defendants should be kept in a single forum." 3 F.3d at 162–63. Here, there are no claims against Lloyd's or any other signatory to the forum selection clauses Citibank seeks to assert. Therefore, *Bonny* does not require dismissal.

In *Roby,* the Second Circuit dismissed claims against Lloyd's, which was clearly a party to the forum selection clause in the general undertaking, as well as claims against Lloyd's syndicates, Lloyd's Managing Agents and individual "Chairs" of the Managing Agents (who were themselves agents of the Managing Agents) none of whom were direct parties to the forum selection clause in the General Undertaking. In dismissing the claims against the syndicates, the Second Circuit stated:

The extremely broad language of the General Undertaking should make it clear that Lloyd's intent was to benefit all Lloyd's entities, particularly because potential actions against Lloyd's itself are limited in nature and the broad language of paragraphs 2.1 and 2.2 otherwise would be sorely overbroad. Moreover, paragraph 1, which is the only other substantive provision in the General Undertaking, requires Names to abide by the provisions of any other contract authorized by the Council.... We believe this indicates that the General Undertaking was meant to govern the Names' general obligations within the entire Lloyd's community.

996 F.2d at 1359.

The circumstances in *Roby,* however, differ in a number of material respects from the circumstances presented here. First, as in *Bonny,* plaintiffs in *Roby* made claims against Lloyd's itself. No claim against Lloyd's is asserted here. Second, the non-parties who were permitted to invoke the forum selection clause in *Roby* were either entities that existed only within the Lloyd's community (the syndicates and the Managing agents) or were agents of those entities whose liability was based exclusively on the actions of those entities (the Chairs). Although Citibank claims to be nothing more than an agent of Lloyd's, that contention is in dispute, as discussed in section III below. And while Citibank's role as trustee is certainly integral to Lloyd's international operations, *see In re Lloyd's,* 928 F.Supp. at 338, it is not a "Lloyd's entity," as the syndicates were in *Roby.* Rather, Citibank is an independent entity that serves a limited, albeit important, function as trustee of premiums held in connection with American Business. Unlike the syndicates, which exist and operate only within the Lloyd's market, Citibank's Lloyd's-related functions comprise a

small proportion of Citibank's overall activity.

Finally, to the extent that the breadth of the forum selection clauses standing alone could give rise to an inference of intent on the part of Lloyd's to confer the benefit of those clauses on Citibank, such an inference is negated here by the conspicuous absence of such a clause from the one document to which Citibank is a signatory, the LATD.

Accordingly, Citibank is unable to enforce the forum selection clause as an intended beneficiary.

### 3. *Citibank Is Not a Promisee*

The two parties to the General Undertaking are the Name and Lloyd's, which is, defined in the introductory clause to the General Undertaking to include not only "any officer or employee of Lloyd's," but also "any person in or to whom either individually or collectively any powers or functions are vested or delegated by or pursuant to Lloyd's Acts 1871–1982."

Citibank asserts that as an entity to whom the function of trustee is delegated, it is a "promisee" of the General Undertaking entitled to rely upon the forum selection clause contained in it. Citibank has cited no case law indicating that such a non-signatory "promisee" is entitled to enforce a forum selection clause. It seems to be a variation on the intended beneficiary argument rejected above. Again, the absence of a forum selection clause in the LATD defeats any inference that the forum selection clause was intended to apply to disputes between the Names and the trustee.

### 4. *The Names' Alleged "Reliance" on the General Undertaking Does Not Entitle Citibank to Enforce the Forum Selection Clause*

Finally, Citibank asserts that, because Plaintiffs become Names only by virtue of their assent to the General Undertaking, they are ultimately relying on the General Undertaking to raise their claims under the LATD.

The Names and Citibank are designated as parties to the LATD (LATD Intro. ¶ 2), and the Names are also explicitly beneficiaries under the deed. LATD Art. Seventh. Although the Names could not have been parties to or beneficiaries of the LATD if they had not signed the General Undertaking, they do not rely on the substance of the General Undertaking to sue Citibank. Instead, the Names rely on the LATD, which does not contain a forum selection clause. It is, as Citibank itself acknowledges throughout its supporting briefs, the terms of the LATD and New York trust law that govern the relationship between the parties.

Moreover, to the extent that Plaintiffs do "rely" on the General Undertaking, such reliance does not answer the question of whether Citibank, as a non-signatory of the General Undertaking, should be permitted to enforce the General Undertaking against them. As discussed above, there is no reason to infer in these circumstances that Lloyd's should be entitled to enforce an agreement to which it was not a party.

### B. *Forum Non Conveniens*

Citibank contends that the doctrine of *forum non conveniens* mandates dismissal of Plaintiffs' claims against it.

■ There is a strong presumption in favor of plaintiff's choice of forum. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947) ("[T]he plaintiff's choice of forum should rarely be disturbed."). However, the trial court may, in the exercise of discretion, dismiss a case on the grounds of *forum non conveniens. Koster v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524, 67 S.Ct. 828, 831–32, 91 L.Ed. 1067 (1947); *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241, 102 S.Ct. 252, 258, 70 L.Ed.2d 419 (1981). Because the central purpose of the doctrine of *forum non conveniens* is to ensure that the trial is convenient, "dismissal will ordinarily be appropriate where trial in the plaintiff's chosen forum imposes a heavy burden on the defendant or the court, and where the plaintiff is unable to offer any specific reasons of convenience supporting his choice." *Piper*, 454 U.S. at 249, 102 S.Ct. at 262.

In *forum non conveniens* analysis, the threshold issue is whether an adequate alternative forum is available. *Piper*, 454 U.S. at 254, 102 S.Ct. at 265; *Blanco v. Banco Indus. de Venezuela, S.A.*, 997 F.2d 974, 981 (2d Cir.1993). Normally, an adequate alternative forum is available when the defendant is "amenable to process" in that forum. *Piper*, 454 U.S. at 254 n. 22, 102 S.Ct. at 265 n. 22; *Blanco*, 997 F.2d at 981. However, the Supreme Court has acknowledged that "where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative." *Piper*, 454 U.S. at 254 n. 22, 102 S.Ct. at 265 n. 22.

If the trial court determines that an adequate alternative forum exists, then the court must consider the relevant "private interest factors" and "public interest factors" and determine whether "the balance of convenience tilts strongly in favor of trial in the foreign forum." *R. Maganlal & Co. v. M.G. Chemical Co., Inc.*, 942 F.2d 164, 167 (2d Cir.1991). In *Gilbert*, 330 U.S. at 508–09, 67 S.Ct. at 843, the Supreme Court provided a list of "private interest factors" and "public interest factors" to guide trial court discretion in this analysis.

The "private interest factors" include the private interests of the litigants; the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; the enforceability of a judgment; and "all other practical problems that make trial of a case easy, expeditious and inexpensive." *Id.* at 508, 67 S.Ct. at 843.

The "public interest factors" include the interest in avoiding administrative difficulties arising from court congestion; the interest in avoiding the unfair imposition of jury duty on citizens of an unrelated forum; the "local interest in having localized controversies decided at home;" the interest in having a diversity case tried in a forum that is at home with the law governing the case, the interest in avoiding unnecessary problems with the conflict of law, or the application of foreign laws; and the interest "[i]n cases which touch the affairs of many persons" in insuring that such individuals will have access to the trial. *Id.* at 508–09, 67 S.Ct. at 843.

Because "[the] strong presumption in favor of the plaintiff's choice of forum ... may be overcome only when the private and public interest factors clearly point towards trial in the alternative forum," *Piper*, 454 U.S. at 255, 102 S.Ct. at 265–66, dismissal for *forum non conveniens* is the exception, not the rule. *See Gilbert*, 330 U.S. at 504, 67 S.Ct. at 840–41; *Maganlal*, 942 F.2d at 168.

### A. *An Adequate Alternative Forum Exists*

Because this Court could condition a *forum non conveniens* dismissal on Citibank's consent to submit to jurisdiction in the United Kingdom and "United States courts consistently have found [English courts] to be neutral and just forums," *Roby*, 996 F.2d at 1363 (2d Cir.1993), the English courts offer an adequate alternative forum.

Plaintiffs claim that the English courts are not adequate because the United Kingdom does not have the procedural equivalent of a class action. However, this contention is without merit. The absence of a rule providing for class actions in the alternative forum does not render the forum inadequate. *In re Union Carbide Corp. Gas Plant Disaster*, 634 F.Supp. 842, 852 (S.D.N.Y.1986), *aff'd as modified*, 809 F.2d 195 (2d Cir.1987). Furthermore, although English law lacks the exact procedural equivalent of the American class action suit, it provides other procedural mechanisms to handle cases involving multiple plaintiffs—including representative actions, "test" cases, and the consolidation of multiple actions. Thus, the English courts are an adequate alternative to a U.S. forum.

### B. *The Public & Private Interest Factors Do Not Support Dismissal*

After finding that an adequate alternative forum exists, this Court looks to the factors set forth in *Gulf Oil*, 330 U.S. at 508–09, 67 S.Ct. at 843, to determine whether "the balance of convenience tilts strongly in favor of trial in the foreign forum." *Magan-*

*lal,* 942 F.2d at 167. Because the public and private interests do not clearly support trial in the courts of England, the presumption in favor of the Names' choice of forum prevails, and the motion to dismiss on the grounds of *forum non conveniens* will be denied.

### 1. *Private Interest Factors*

· The private interest factors favor litigation in New York. With respect to the private interests of the litigants, Plaintiffs have unequivocally expressed their preference for a New York forum. *See Koster,* 330 U.S. at 524, 67 S.Ct. at 832 (1947) ("In any balancing of conveniences, a real showing of convenience by a plaintiff who has sued in his home forum will normally outweigh the inconvenience the defendant may have shown."); *Piper Aircraft Co.,* 454 U.S. at 255, 102 S.Ct. at 265–66 (1981) ("there is ordinarily a strong presumption in favor of the plaintiff's choice of forum, which may be overcome only when the private and public interest factors clearly point towards trial in the alternative forum."); *Founding Church of Scientology v. Verlag,* 536 F.2d 429, 435 (D.C.Cir.1976) ("[C]ourts should require positive evidence of unusually extreme circumstances, and should be thoroughly convinced that material injustice is manifest before exercising any such discretion to deny a citizen access to the courts of this country." (citations omitted)); *see also Maganlal,* 942 F.2d at 167.

Although Citibank, by its motion, has expressed a preference for an English forum, it is less plausible for a corporation headquartered in New York, such as Citibank, to assert that it is grossly inconvenient for it to be forced to litigate in New York than it would be for a foreign defendant to so assert.

With regard to the interest in easy access to evidence and witnesses, because the question fundamentally at issue in this case is whether Citibank, as American Trustee pursuant to the LATD, breached its fiduciary duties to the Names, the focus of this lawsuit is on the actions of Citibank in New York. Therefore, the central sources of proof, such as Citibank's books and records concerning its actions as American Trustee, and wit-· nesses, such as Citibank employees who ad-

ministered the LATF, are readily available in New York. Although a presentation of Citibank's defense that it was merely a custodian of the funds following Lloyd's instructions may require obtaining evidence or calling witnesses from England, that possibility alone does not overcome the Names' choice of forum. First, Citibank does not argue that such witnesses will be unwilling to testify in the United States. Furthermore, Citibank may implead Lloyd's as a third party defendant (see Section II, below) and thus compel the attendance of relevant Lloyd's witnesses. To the extent it chooses not to do so, it may obtain evidence from the United Kingdom through letters rogatory. See Fed. R.Civ.P. 28(b); *Maganlal,* 942 F.2d at 169.

Moreover, New York is the site of the trust res. As the Second Circuit noted in *Republic of Philippines v. Marcos,* 806 F.2d 344, 361 (2d Cir.1986), it is "difficult to deem the Southern District of New York an inconvenient forum" when an action concerns property located within it. Moreover, as these trusts were created in New York, are governed by New York law, and the trustee, Citibank, is headquartered in New York, issues concerning the trusts clearly fall within the province of a New York court. *See In re Davis' Trust,* 26 Misc.2d 1077, 202 N.Y.S.2d 106 (Sup.Ct.N.Y.Cty.1960) (holding that court properly had power to administer trust created pursuant to laws of New York by New Jersey resident even though power of appointment created thereunder had been exercised in·England for benefit of minors residing in England because res of trust remained in New York).

In addition, if an English court were to render a judgment for the Plaintiffs on its claims for an accounting or injunction, those judgments would have to be enforced by a court in New York, where Citibank manages the trust fund.

### 2. *Public Interest Factors*

The public interests factors also support a New York forum. First, because the dispute between the Names and Citibank is governed by New York law, there is no question that the Southern District of New York, rather than an English court, would be more famil-

iar with the law governing this dispute. *See Gilbert,* 330 U.S. at 509, 67 S.Ct. at 843 (discussing the preference for having a local court decide local law, rather than having a foreign court "untangle problems . . . in law foreign to itself").

Second, although this case is not purely a "localized controversy," because the Names who are beneficiaries of the LATF do not solely reside in the United States and the operation of Lloyd's may be implicated, New York has a strong interest in this case. Not only is New York the site of the trust res, but the trust deeds are instruments negotiated in New York and subject to New York law. Moreover, the New York Department of Insurance's investigation and increased regulatory supervision further demonstrate New York's interest in the administration of the LATF.

Accordingly, this Court will not exercise its discretion to dismiss the case under the doctrine of forum non conveniens.

## II. *Citibank's Motion to Dismiss for Failure to Join Indispensable Parties*

Pursuant to Rule 12(b)(7), Fed.R.Civ.P., Citibank moves to dismiss this case for nonjoinder of indispensable parties under Rule 19. Citibank contends that the Council and Corporation of Lloyd's (collectively "Lloyd's"), the Managing Agents and the Members' Agents (collectively the "Agents"), and the non-American Names are all necessary and indispensable parties. For the following reasons, Citibank's motion to dismiss is denied.

 On a motion to dismiss for failure to join an indispensable party, a court's analysis proceeds in two steps. *Associated Dry Goods Corp. v. Towers Fin. Corp.,* 920 F.2d 1121, 1123 (2d Cir.1990). First, the court must determine whether the absent party is a "party to be joined if feasible" (i.e., a "necessary party") under Rule 19(a). Only if the court determines that the party is to be joined if feasible but cannot be joined, must the court proceed determine whether, under Rule 19(b), the absent party is "indispensable" and the action should "in equity and good conscience" be dismissed.

Rule 19(a) sets forth the standards for determining when a party should be joined if feasible:

> A person . . . shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede that person's ability to protect that interest or (ii) leave any of the parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of the claimed interest.

Fed.R.Civ.Proc. 19(a).

If a person who meets this standard cannot be joined, this Court must determine:

> whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable.

Fed.R.Civ.Proc. 19(b).

[12] In determining whether an absent party is indispensable, this Court must consider four "interests:" (1) the plaintiff's "interest in having a forum;" (2) the defendant's interest in avoiding "multiple litigation, or inconsistent relief, or sole responsibility for a liability he shares with another;" (3) "the interest of the outsider whom it would have been desirable to join;" and (4) the "interest of the courts and the public in complete, consistent, and efficient settlement of controversies." *Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 109–11 & n. 2, 88 S.Ct. 733, 737–39 & n. 2, 19 L.Ed.2d 936 (1968); *Envirotech Corp. v. Bethlehem Steel Corp.,* 729 F.2d 70, 73 (2d Cir.1984).

 In applying Rule 19, a court should generally be reluctant to dismiss a case for failure to join a party. *See Jaser v. N.Y. Property Ins. Underwriting Ass'n,* 815 F.2d 240, 242 (2d Cir.1987) ("very few cases should be terminated due to the absence of non-diverse parties unless there has been a reasoned determination that their nonjoinder

makes just resolution of the action impossible"); *Drankwater v. Miller*, 830 F.Supp. 188, 191 (S.D.N.Y.1993) ("Rule 19 should be applied narrowly"). In lawsuits involving trusts, despite the heightened risk of inconsistent judicial orders and multiple litigation, "the judicial tendency is to make every effort to conclude that 'in equity and good conscience' the action may proceed and to avoid dismissing it on the ground that the absentee is an indispensable party under Rule 19(b). 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, Civil 2d § 1618, at 264–77 (1986). The decision whether or not to dismiss an action, however, ultimately rests within the district court's equitable discretion. *Ente Nazionale Idrocarburi v. Prudential Secs. Group, Inc.*, 744 F.Supp. 450, 456 (S.D.N.Y. 1990).

■ Although it is not certain that the non-American Names are parties to be joined if feasible,[5] Plaintiffs primary response to Citibank's argument with respect to these Names is that it is willing to amend the Complaint to include all Names who underwrote American Business in the class definition. *See* Rule 19(d). This Court has jurisdiction over the non-American Names because it has jurisdiction over the res of the American Trust Fund which constitutes a fund that may be insufficient to satisfy all claims, thus warranting certification pursuant to Rule 23(b)(1)(B), and because Plaintiffs are seeking injunctive and equitable relief. *See DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1175 (8th Cir.1995). Citibank argues that such an amendment is inadequate because it would make certification of the class impossible. However, the certifiability of the class is not before the Court on this motion to dismiss. Thus, Plaintiffs will be directed to amend the complaints to include non-American Names in the class definition.

Plaintiffs do not seriously dispute that Lloyd's and the Agents are parties to be joined if feasible. Lloyd's and the Agents would be affected by the relief sought, an injunction prohibiting Citibank from carrying out certain of their directions with respect to funds in the LATF.

■ Plaintiffs contend, however, that Lloyd's and the Agents are not indispensable under Rule 19(b), because Citibank could bring them into the action by filing a third party complaint pursuant to Rule 13(h) or by impleading Lloyd's pursuant to Rule 14. Plaintiffs also contend that Lloyd's and the Agents' ability to intervene obviates any prejudice to them that would otherwise make them indispensable.

■ "[T]he notion of equity and good conscience contemplates that the parties actually before the court are *obliged to pursue*

5. Citibank speculates that the absent Names might have interests that differ from those of the American Names. First they suggest that the other Names might prefer another forum. However, this interest is insufficient to make the non-American Names necessary, since, unless they are joined in this action, they will not be precluded from bringing suit elsewhere. Citibank next suggests that the absent Names might perceive that the injunctive relief sought would jeopardize the security of their policy-holders and thus detrimentally affect their underwriting business. Aside from the vagueness of this claim, it is conceivable that this Court could shape any injunctive relief to minimize the risk of harm to the policyholders of solvent Names. *See* 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Fed. Practice & Proc.*, Civ.2d, § 1608 at 106–111.

Citibank also asserts that there can be no proper adjudication concerning a trust unless all parties with a potential stake are represented, and that the non-American Names have a stake in "the" LATF. This contention is questionable for two reasons. First, because each Name allegedly has his or her own individual trust, none of the absent Names has a stake in the trust funds of the represented Plaintiffs. Second, the cases Citibank cites for this proposition (*Grace v. Carroll*, 219 F.Supp. 270, 273 (S.D.N.Y.1963) and *Fitzgerald v. Jandreau*, 16 F.R.D. 578, 580 (S.D.N.Y. 1954)) predated the current version of Rule 19, enacted in 1966. Subsequent case law makes clear that not all parties with an interest in a trust need be joined. *See* 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Fed. Practice & Proc.*, Civ.2d, § 1618.

Finally, Citibank contends that the non-American Names are necessary parties because of the risk that it will be exposed to multiple and inconsistent litigation. However, Citibank does not allege that it is a defendant in similar actions in any other court. A speculative risk of future litigation is insufficient to render the absent Names necessary parties. *See Morgan Guar. Trust Co. v. Martin*, 466 F.2d 593, 597–98 (7th Cir.1972) (remote risk insufficient); *Drankwater*, 830 F.Supp. at 193–94 (S.D.N.Y.1993).

any avenues for eliminating the threat of prejudice." *Associated Dry Goods*, 920 F.2d at 1124–25 (emphasis by court) (quoting 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, Civ.2d § 1608, at 112–13). Moreover, when an absent party can protect its interests by intervening without destroying subject matter jurisdiction, such a party need not be considered indispensable, unless intervention would impose "undue hardship" on the absentee. *See* 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, Civ.2d § 1608, at 113–14.

Citibank contends that *Associated Dry Goods* is inapplicable here, because it has no basis for filing a crossclaim or counterclaim and thus cannot bring a third party complaint against Lloyd's or the Agents pursuant to Rule 13(h), as defendants in *Associated Dry Goods* could. However, Citibank reads *Associated Dry Goods* too narrowly. The Court's reasoning is not limited to those situations where a defendant could eliminate prejudice through third-party actions pursuant to Rule 13(h). Rather, where a defendant has any means of eliminating the potential prejudice, the defendant is obliged to pursue it. Thus, even if Citibank is correct that it cannot bring a third party claim pursuant to Rule 13(h), it is still obliged to eliminate the asserted prejudice to Lloyd's and the Agents by impleading them pursuant to Rule 14. Citibank does not contend that it is unable to do so, but only that it should not be compelled to do so, since the need to join the absent parties is not dependent on a claim by Citibank for contribution or indemnity. However, the fact that Lloyd's and the Agents have interests that could be impaired even absent a claim against them by Citibank does not relieve Citibank of its obligation to pursue this avenue of eliminating the prejudice to the absent parties.

Moreover, even if Citibank is unable to implead Lloyd's and the absent Agents,[6] these non-parties could protect their interests by intervening in the action pursuant to Rule 24. *See* 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Prac-*

*tice and Procedure*, Civ.2d § 1608, at 113–14; *PepsiCo, Inc. v. F.T.C.*, 472 F.2d 179, 187–88 (2d Cir.1972) (holding that because absent bottlers could intervene before FTC, they were not indispensable, and thus their absence did not render FTC order unenforceable, despite potential for absent bottlers to bring contract claims against Pepsico if FTC order was enforced). Although Lloyd's and the Agents may find intervention inconvenient, and may find it frustrating to be obliged to appear in a foreign court despite the existence of forum selection clauses in many of their agreements with Names, such inconvenience and frustration is not the sort of undue burden that, in equity and good conscience, requires dismissal. This is particularly true since the interests of the Agents (for whom intervention would be most inconvenient) in the outcome of the litigation coincide with the interests of Lloyd's. Thus, Lloyd's could intervene and adequately protect the interests of the Agents.

Accordingly, Citibank's motion to dismiss for failure to join indispensable parties will be denied, and Plaintiffs are directed to amend their complaint to include non-American Names in the class definition.

### III. Motion to Dismiss for Failure to State a Claim

On a Rule 12(b)(6) motion to dismiss, the factual allegations of the complaint are presumed to be true and all factual inferences must be drawn in the plaintiffs' favor and against the defendants. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989). Rule 12(b)(6) imposes a substantial burden of proof upon the moving party. A court may not dismiss a complaint unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir.1994) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)); *see also H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249–50, 109 S.Ct. 2893, 2905–06, 106

---

**6.** Citibank contends that some of the Agents would not be subject to service of process.

L.Ed.2d 195 (1989); *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984).

### A. *The Accounting Claim Will Be Dismissed*

As a general matter, a beneficiary of a trust has a right to demand an accounting of the trustee. *Matter of Kummer,* 93 A.D.2d 135, 461 N.Y.S.2d 845, 862 (2d Dep't 1983). However, a settlor of an inter vivos trust, such as the one at issue in this case, may limit the rights of a beneficiary to demand an accounting. *Application of Central Hanover Bank & Trust Co.,* 176 Misc. 183, 26 N.Y.S.2d 924, 927 (Sup.Ct. N.Y.Cty.), *aff'd* 263 A.D. 801, 32 N.Y.S.2d 128 (1st Dep't 1941), *aff'd* 288 N.Y. 608, 42 N.E.2d 610 (1942). Moreover, New York law permits a settlor, through the trust instrument, to appoint a single party who can settle an accounting on behalf of all other individuals interested in the trust, provided that party accepts the accounting in good faith. *See In re Gilchrist,* 206 Misc. 687, 134 N.Y.S.2d 639, 644 (Sup.Ct. Westchester 1954) *modified on other grounds sub nom. In re O'Malley's Trust,* 286 A.D. 869, 142 N.Y.S.2d 21 (2d Dep't 1955) (provision granting settlor power to settle account on behalf of all interested parties held valid); *In re Fifth Ave. Bank,* 75 N.Y.S.2d 888, 889 (Sup.Ct.N.Y. County 1947) (upholding trust agreement providing that specific beneficiary could settle account on behalf of all interested parties); Restatement (2d) of Trusts § 172, comment d; 106 N.Y.Jur.2d, Trusts § 367.

Citibank has no duty to provide an accounting to the Names, as the LATD expressly designates the Agent as the only party that may require an accounting. Plaintiffs contend that they should nonetheless be entitled to an accounting directly from Citibank, advancing three distinct arguments.

First, Plaintiffs maintain that Article Eleventh, which provides that Citibank is accountable only to the agents, should be void as violative of public policy because "Citibank is, in effect, not accountable to anyone with an interest in the trusts." Plaintiffs rely on *In re Uran,* 24 Misc.2d 1069, 204 N.Y.S.2d 840, 842 (Sup.Ct.N.Y. County 1960), which voided a trust provision stating that "The trustees ... shall in no circumstances be obligated to make any accounting," and *In re Kassover,* 124 Misc.2d 630, 476 N.Y.S.2d 763, 764 (Sur.Ct. Nassau County 1984), which voided a provision where the "trustee [was] accountable only to himself." However, Plaintiffs' reliance is misplaced, in that the LATD does not eliminate the trustee's obligation to account, but requires that Citibank account to the agents. And as long as there is someone to whom the trustee must account, the trust deed can, as a matter of law, limit the parties to whom the trustee must account.

Plaintiffs argue that Citibank is in effect accountable to no one because it is only accountable to Lloyd's, which Plaintiffs describe as a party to the alleged subversion of the trust. However, Citibank accounts not to Lloyd's, but to the Names' Agents, who are themselves accountable to the Names. If the Names do not receive accountings from their Agents, they may have a cause of action against the Agents, but not against Citibank.

Second, Plaintiffs argue that, as principals, they can step into the shoes of their agents to receive an accounting from Citibank. However, the cases cited by Plaintiffs merely state that in some limited instances a principal may enforce a contract entered into on his or her behalf by his agent. But the deed here, assuming for the moment it could be enforced as a contract, provides that Citibank has no duty to account to anyone but the agents. Having the Names step into the agents' shoes would only permit the Names to compel Citibank to account to the Agents, which Citibank has already done. *See Rush Presbyterian St. Luke's Medical Ctr. v. Safeco Ins. Co.,* 825 F.2d 1204, 1206 (7th Cir. 1987) ("[t]he court does not question the general rule that a disclosed principal may enforce rights under an agreement entered into by its agent. However, where the agreement unambiguously and unequivocally sets forth the intention of the parties to limit the [principal's] right to bring an action on the agreement, the general rule is inapplicable.").

■ Third, plaintiffs argue that a limitation of a trustee's duty to account is void in the face of allegations of wrongdoing or bad faith. However, conclusory allegations of bad faith do not suffice to void a provision of a trust. *Carletta v. Albini*, 14 A.D.2d 813, 221 N.Y.S.2d 189, 190 (2d Dep't 1961). Plaintiffs do not allege that the Agents engaged in self-dealing, collusion with Citibank, conflict of interest, or any other bad faith or betrayal of the Names' interests *with respect to the accountings*. The generalized allegations of bad faith are not inconsistent with the presumption that the Agents have the same interests as the Names they represent. There is thus no reason to disturb the mechanism for *accounting* in the LATD, even if Plaintiffs have adequately pleaded bad faith against Citibank in other respects. In any event, the cases Plaintiffs cite do not support their position. *In re Salkin*, 8 A.D.2d 712, 186 N.Y.S.2d 510 (1st Dep't 1959), actually upheld a party's ability to limit an accounting to specific parties, and in doing so stated that if the plaintiff's allegations survived a motion to dismiss, the plaintiff could not get an accounting but would be entitled to discovery. *In re Uran* is inapplicable because the deed purported to relieve the trustee of all duty to account whatsoever, and was thus void (or voidable) regardless of any bad faith.

Therefore, Plaintiffs' claim for an accounting will be dismissed.

### B. *The Breach of Fiduciary Duty Claim Will Not Be Dismissed*

■ A trustee generally has a duty of undivided loyalty to the beneficiaries of a trust. *City Bank Farmers Trust Co. v. Cannon*, 291 N.Y. 125, 131, 51 N.E.2d 674 (1943); *Benenson v. Fleischman*, No. 94 Civ. 5009, 1995 WL 303618 at *4 (S.D.N.Y. May 18, 1995). Plaintiffs allege that Citibank breached its duty of loyalty in several respects. Citibank allegedly abdicated complete control over the American Trust Funds to Lloyd's. Complaint ¶¶ 96, 97, 100, 107, 108, 109. Even though Citibank was charged as trustee with the duty of preserving and protecting the trust res for the beneficiaries, Citibank allowed Lloyd's unsupervised and unquestioned access to the funds. ¶¶ 107–09.

Plaintiffs also allege that Citibank breached its duty of loyalty by placing its own interests above those of the beneficiaries. Specifically, plaintiffs allege that when a Gooda Walker syndicate was unable to pay its insureds' claims, it received "loans" from other accounts in the LATF and from Citibank. Proceeds from subsequent cash calls were first used to repay Citibank, rather than replenishing the accounts of the lending Names, the beneficiaries of the trusts. Many of these loans by Names allegedly remain unpaid.

Plaintiffs also allege that Citibank breached its duty of loyalty by failing to take any steps required of a trustee, including establishing separate trust funds, keeping books and records, providing plaintiffs with information about the trust res, investing the plaintiffs' monies prudently, and ensuring that instructions transmitted by Lloyd's that Citibank chose to follow did not harm the beneficiaries.

Citibank contends that each of the actions that Plaintiffs allege as a breach of duty was specifically authorized by the LATD and thus is not actionable. However, not all of the alleged actions were specifically authorized by the LATD as it existed at the time of the actions alleged in the Complaint.

Citibank concedes that the LATD does not relieve it of the duty to preserve the property of the trust, which duty Plaintiffs allege Citibank has breached by failing to create individual trusts for each name and transferring funds from a Name's trust to pay liabilities not attributable to that Name. Compl. ¶ 107–114.

■ Citibank contends that the provisions of the LATD that permit "commingling" of funds and investment at the direction of the Agent insulate it from liability for those actions. However, the "commingling" provisions of the LATD in force at the time of the alleged breaches do not permit the trustee to neglect its duty to create separate trusts. Citibank relies specifically on language in the December 1995 revision of the LATD (the "Amended LATD") providing that the Trustee need not maintain records for individual Name's accounts. *See* Amend-

**680**

ed LATD ¶ 7.8. However, this language does not by its terms apply to actions taken before the revision, such as Citibank's alleged failure to set up individual accounts in the first instance. Even if it did apply retroactively, Plaintiffs allege that the revision was a collusive effort on the part of Citibank and Lloyd's Agents to deprive them of redress for the breaches alleged in the Complaint. Such an effort would itself be a breach of the duty to the Plaintiffs (who are both beneficiaries and settlors of their individual LATFs) and should not be permitted to shield Citibank from liability. *See* Restatement (Second) of Trusts § 222(3) ("To the extent to which a provision relieving the trustee of liability for breaches of trust is inserted in the trust instrument as the result of an abuse by the trustee of a fiduciary ... relationship to the settlor, such a provision is ineffective.") The timing of the amendment provides at least some factual support for this contention, and so it would be inappropriate to dismiss on the basis of the Amended LATD at the pleadings stage.

No provision of the LATD expressly permits the inter-Name and inter-syndicate "loans" alleged by the Plaintiffs. Citibank contends that this practice constitutes permissible "commingling" or is a permissible investment, because Lloyd's Agents directed the loans at issue. However, commingling is not clearly defined. The commingling provision may permit consolidating funds for deposit in a single bank account or other limited purposes, but it does not necessarily permit the shifting of liability to solvent Names and syndicates from insolvent Names and syndicates that allegedly occurred here. *See In re Estate of Nelson,* 95 Misc.2d 215, 407 N.Y.S.2d 773, 775 (Surr.Ct.Westchester Cty. 1977) ("The fact that the trustees are authorized to administer the [three] trusts in solido does not destroy the separate nature of each trust"). The Names nowhere agreed to assume the liabilities of other Names, and a generic commingling provision should not be held to permit a trustee to impose such liabilities.

▮ Moreover, to the extent the inter-Name and inter-syndicate loans can be characterized as investments, they fail to comply with the prudent investor rule imposed by N.Y. EPTL § 11–2.3(a), in that loans to insolvent Names were highly likely to be uncollectible. Citibank contends that its prudent investment obligations are excused by the provision of the trust deed that directs Citibank to follow the Agent's instructions with regard to investments. While it is true that a settlor may vary a trustee's duty to comply with the prudent investor standard under EPTL § 11–2.3(a), the LATD as it existed at the time of the alleged "loans" did not expressly relieve Citibank of its prudent investment duty. A reasonable interpretation of the LATD's provisions with respect to Citibank's investment duties is that Citibank is to comply with Lloyd's instructions, but only in so far as such instructions are consistent with the prudent investment rule. Once again, Citibank refers to language in the Amended LATD that purports to relieve the trustee of liability for failing to inquire "as to the necessity, expediency or propriety of any such investment and shall be fully protected in acting at the discretion of the Agent with respect to any investment." Amended LATD ¶ 7.3. As discussed above, the Amended LATD does not apply to alleged activities that took place before its enactment. The added language only emphasizes further that the prior trust instrument did *not* relieve Citibank of its prudent investment obligations. To the extent the Amended LATD was intended to apply retroactively, a question of fact remains as to whether the amendment itself was a breach of fiduciary duty, rendering its terms inapplicable.

▮ In addition, Plaintiffs allege that Citibank took proceeds from cash calls as repayment for loans it made to the Gooda Walker syndicate before repaying the beneficiary Names whose funds had been "borrowed" to cover Gooda Walker shortfalls. Such conduct constitutes a classic breach of the duty of loyalty, which requires that the trustee put the interests of the beneficiary before its own. *See* 106 N.Y.Jur.2d Trusts § 283. Citibank contends that by the express terms of the LATD, it is relieved of the duty of undivided loyalty, and thus cannot be held liable for those actions that allegedly breached a duty of loyalty. As with other

exculpatory provisions relied upon by Citibank, the clause relieving the trustee of its duty of undivided loyalty appears only in the Amended LATD, and is thus inapplicable to the conduct alleged.

■ Citibank's repeated assertions that it cannot be held liable because it has merely followed the terms of the trust are insufficient to shield it entirely from liability. *See Beck v. Manufacturers Hanover Trust Co.,* 218 A.D.2d 1, 10, 632 N.Y.S.2d 520, 526 (1st Dep't 1995) (reinstating a complaint against trustee for breach of fiduciary duty despite trustee's claim that he had performed in strict compliance with terms of trust indenture). Citibank's repeated contention that it was a mere instrumentality acting at the behest of Lloyd's Agents conflicts with the basic presumption that a trustee must exercise discretion over the trust property for the benefit of the beneficiary. *Cf.* 106 N.Y.Jur.2d §§ 45, 47–48 (passive trusts, in which trustee has mere naked title with no active duties or discretion with regard to trust property, is invalid).

■ Administration of a trust normally rests with the trustee. *In re Pate's Estate,* 84 N.Y.S.2d 853, 862 (Surr.Ct.N.Y.Cty.1948), *aff'd,* 276 A.D. 1008, 95 N.Y.S.2d 903 (1st Dep't 1950); *Earle v. Earle,* 93 N.Y. 104 (1883). The trustee may not passively permit another party to harm the trust. In *In re Osborn,* 252 A.D. 438, 299 N.Y.S. 593 (2d Dep't 1937), the remainder beneficiary sued the trustee, claiming that the trustee had not exercised any restraint or supervision over the life tenant's withdrawal of funds from the trust estate, thereby surrendering the judgment and discretion confided in it by the trust agreement and becoming merely passive. Although the trust indenture granted very broad discretionary powers to the trustee, including the discretion to invade the corpus of the trust to pay for the support and care of the life tenants, the court held that if indeed the trustee had permitted the settlor to access the funds without supervision or restraint, then "the trustee did abandon and surrender its own duties in a large measure and remained passive. Having accepted the trust and undertaken to discharge its duty, it had no power to make such delegation of powers.... It was the duty of the trustee to act in good faith and employ such vigilance, sagacity, diligence, and prudence in the management of the trust estate as in general prudent men of discretion and intelligence employ in their own affairs." *In re Osborn,* 299 N.Y.S. at 600–01.

There must be some consequence to the designation "trustee." This Court is reluctant to find that an ambiguous trust instrument relieves Citibank of the consequences of being a trustee, especially in light of the fact that Citibank enjoys the compensation and other benefits of being a trustee.

Accordingly, Plaintiffs' claim for breach of fiduciary duty will not be dismissed.

## C. The Breach of Contract Claim Will Be Dismissed

To state a claim for breach of contract, Plaintiffs must allege the existence of a contract, performance of the contract by one party, breach of contract by the other, and damages caused thereby. *Cohen v. Loeb Partners Corp.,* No. 90 Civ. 5175, 1992 WL 84535, at *2 (S.D.N.Y. April 13, 1992).

■ However, it is a long-standing rule that trust beneficiaries, such as Plaintiffs here, may not bring an action for breach of contract against a trustee based on the trustee's alleged failure to perform its duties pursuant to a trust deed. Rather, trust beneficiaries may seek only equitable relief from a trustee. *Swan Brewery Co. v. United States Trust Co.,* 143 F.R.D. 36, 40 n. 1 (S.D.N.Y. 1992); *Husted v. Thomson,* 158 N.Y. 328, 337, 53 N.E. 20, 22 (1899); *Van Camp v. Orleans County Nat. Bank,* 147 N.Y. 150, 161, 41 N.E. 427, 430 (1895). *See also* Restatement (Second) of Trusts § 197 & cmt. b (creation of trust is conveyance of beneficial interest in trust property, not contract enforceable in action at law); Scott, *The Law of Trusts* § 197.2, at 193 (action for breach of contract cannot be maintained against trustee who merely agrees to administer trust).

Accordingly, the breach of contract claim will be dismissed.

### D. *Plaintiffs' Claim for Injunctive Relief Will Not Be Dismissed*

Plaintiffs seek to enjoin Citibank from: (1) continuing certain activities that they allege constitute breaches of fiduciary duty; and (2) transferring funds to Lloyd's as part of a reorganization plan.

Citibank contends that the first claim for injunctive relief should be dismissed, because Plaintiffs have failed to state a claim that an injunction could remedy. However, as discussed above, Plaintiffs have stated a claim of breach of fiduciary duty, and their request for an injunction prohibiting future breaches will therefor not be dismissed.

■ Citibank contends that the second prong of Plaintiffs' claim for an injunction should be dismissed because the Complaint does not plead an imminent injury. However, a claim for permanent injunctive relief should not ordinarily be dismissed at the pleadings stage, unless the underlying claim upon which relief is sought is dismissed. *See Tanglewood East Homeowners v. Charles–Thomas, Inc.*, 849 F.2d 1568, 1576 (5th Cir. 1988) (claims seeking injunctive relief not proper subject of motion to dismiss, as plaintiffs sought permanent injunction). Moreover, Paragraph 82 of the Complaint alleges that Lloyd's plans to cause the assets of Names to be transferred to Equitas, a corporation formed to reinsure risks that were otherwise uninsurable. Additional details of this reinsurance plan have subsequently become public. Rather than dismiss this claim for relief, Plaintiffs will be directed to amend the complaint to provide full factual predicate for injunctive relief.

### Conclusion

For the reasons set forth above, Citibank's motion to dismiss the claims for an accounting and for breach of contract are hereby granted. Citibank's motion to dismiss the remaining claims is hereby denied. Plaintiffs are hereby directed to amend the complaint to: (1) include in the class definition all Names who underwrote American Business; and (2) plead additional facts related to their request for an injunction prohibiting Citibank from transferring funds to Lloyd's.

It is so ordered.