Filed 07/31/24

STATE OF VERMONT

SUPERIOR COURT                                    CIVIL DIVISION
Addison Unit                                      Docket No. 23-CV-402


ANNE JACKSON
JEFFREY JACKSON

v.

WILLARD JACKSON, and
WILLARD JACKSON as Trustee for
The William Jackson Trust of 1939 and
The William Jackson Trust of 1941

### FINDINGS OF FACT and CONCLUSIONS OF LAW

Petitioners Anne Jackson and Jeffrey Jackson are two of the three remainder beneficiaries of two trusts administered by their father, Willard Jackson, as Co-Trustee. The third sibling, Susan Jackson-Levine, also a remainder beneficiary, is not a party to this suit, nor is the other Co-Trustee, Chris Grube. The two Petitioners seek the removal of their father as Trustee and termination of the trusts based on a claim of breach of trust. In addition, they seek to have him pay restitution to the trust from personal assets to restore the value of trust assets that they believe were improvidently spent. Respondent denies any breach of trust. Both Petitioners and Respondent seek attorneys' fees for the cost of litigation.

Following a decision from the Probate Division, a *de novo* bench trial was held June 17-21, 2024. Petitioners Anne Jackson and Jeffrey Jackson are represented by Attorneys Kevin M. Henry and Gary L. Franklin. Respondent Willard Jackson is represented by Attorneys Peter F. Langrock and Wendy E. Radcliff.

### *Respondent's Motion for Judgment pursuant to V.R.C.P. 50 (a).*

At the close of Petitioners' evidence, and again at the close of all evidence, Respondent Trustee moved for judgment as a matter of law, arguing that Petitioners' evidence was an insufficient basis for a claim. The court deferred ruling, and now denies the motion. Petitioners introduced evidence in their direct case that Willard as Trustee had used over $16 million to construct a high class inn as a project with personal importance to himself but the present value of the asset is less than its cost and the business does not meet operating costs. In addition, Petitioners presented evidence that due to the complex structure of the investments in this significant component of Trust assets, individual remainder beneficiaries would each have a minority interest in an unsuccessful business venture. Such evidence was sufficient to raise the possibility of violation of a trustee's duty of loyalty to the remainder beneficiaries. Therefore,

1

Respondent was not entitled to judgment as a matter of law based solely on Petitioners' evidence. The motion is hereby denied.

Following the decision to defer ruling, the court continued to take evidence from both parties. The decision below is based on all of the evidence admitted at the hearing.

The attorneys submitted both pre- and post-trial legal memoranda as well as proposed findings of fact and responses to the proposal of the other party.

## FINDINGS OF FACT

The court finds the facts as follows based on the credible evidence admitted at the hearing.

Willard Jackson's father, William Jackson, a resident of New York, established trusts in 1939 and 1941 for the benefit of his two children as income beneficiaries during their lives and for the benefit of his grandchildren as remainder beneficiaries upon the deaths of his children. His children were Willard Jackson (Co-Trustee and Respondent in this suit) and Carolyn Jackson (later known as Carolyn Grube). William[1] also created many other trusts, resulting in a total of approximately 40 trusts after his death of different types and benefiting various people. Assets in all of William's trusts totaled about $20 million at the time of his death.

William died in 1974, and Willard became a Trustee of most of William's trusts. He became Co-Trustee with Joseph Pokart, who had been William's attorney and financial advisor since the 1930's, of Trusts now labelled Trusts 1, 2, 3, and 4, which are the ones pertinent to this case. Willard and Carolyn each became an income beneficiary, and their children became remainder beneficiaries. Assets in these trusts consisted primarily of securities and investments in second mortgages, and Trust provisions gave the Trustees broad power over investments. Willard and Carolyn, each had children. Thus the income beneficiaries were Willard and Carolyn, and the remainder beneficiaries were Willard's children (Susan, Jeffrey, and Anne) and Carolyn's children (Chris, Paul, Marianne, and Peter Grube).

Willard had spent the first three years of his own career working for a life insurance company in which he did real estate appraisals and managed mortgage investments. After that he worked in New York City for 33 years doing investment counselling, investment research, and managing investment accounts. He was a partner in his firm and retired in 1989. From the time of his father's death in 1974, he managed the investments in the trusts his father had established.

At some point after William's death, Willard's sister Carolyn Grube died. Willard continued as beneficiary of trusts 1-4. Trust terms provided that upon his death, the corpus of Trusts 1 and 3 would go to Carolyn's four children in equal shares, and the corpus of Trusts 2 and 4 would go to Willard's three children in equal shares. Willard had other assets and investments of his own, and did not need to rely on the income. With Co-Trustee Joe Pokart and

<hr />

[1] Because all parties have the same surname, hereinafter only first names are used throughout this decision.

the help of investment advisors, he diversified the trust assets. The investments were chosen and managed for future growth rather than to provide income that Willard did not need so as to enlarge the value of the assets that would go to William's seven grandchildren (Willard's children and Carolyn's) upon Willard's death.

Only Trusts 2 and 4, in which Willard's own three children are the remainder beneficiaries, are the subject of this suit. The Grube children are the remainder beneficiaries of Trusts 1 and 3, which have been managed in tandem with Trusts 2 and 4. Neither they nor Petitioners' sibling Susan, also a remainder beneficiary of Trusts 2 and 4, have joined in this suit. Petitioners have not sought removal in this suit of Co-Trustee Chris Grube, current Co-Trustee with Willard of all four trusts, although they subsequently filed a petition in the Probate Division to do so.

Petitioner Jeffrey Jackson is a resident of Shelburne, Vermont, and Petitioner Anne Jackson is a resident of the Cayman Islands. Respondent Willard Jackson is a resident of Cornwall, Vermont. The Trusts have continued to pay taxes as New York trusts.

Both Trusts 2 and 4 were established under New York law and grant broad powers to the trustees, including the right to "sell or otherwise dispose of any or all [existing assets] and to invest and reinvest the proceeds thereof . . . as they in their absolute discretion shall deem proper, wholly without regard to whether the same may be investments authorized for Trustees under the Laws of any State in the United States. . ." Exhibits 1 and 2, Article Eighth (a).

They also specifically authorize distributions of principal in the following manner:

> In the sole and absolute discretion of my Trustees or Trustee, to make all divisions or distributions in kind, or partly in kind and partly in money whenever, pursuant to the provisions of this indenture, they are required to divide the principal of the trust fund into shares or portions of shares or to distribute the same among several individuals; and for the purpose of such allotment, the judgment of my Trustees or Trustee concerning the propriety thereof and the relative value for the purpose of division or distribution of the securities or other property so allotted shall be binding and conclusive on all persons interested hereunder.

*Id,* Article Eighth (f).

Additional provisions pertinent to this case are as follows:

"**ELEVENTH:** The written acceptance by the beneficiary of any account rendered by the Trustees or Trustee shall constitute a final and complete discharge of said Trustees of Trustee as to income and principal in respect to all matters embraced in said account.

"**FOURTEENTH**: The Trustees or Trustee shall not be required to make physical division of the funds of this trust estate, except when necessary for the distribution of principal and in their discretion, they or he may keep the trust corpus in one or more consolidated funds in which the separate shares or portion of shares herein created shall have undivided interests.

"**FIFTEENTH:** It is the intention of the parties hereto that this indenture and the trusts hereby created and all rights hereunder shall be construed and determined in accordance with the Laws of the State of New York."

*Id.*

Willard's investment decisions in general over the years, both for the trusts he administered and for his own holdings, resulted in overall increased value of assets. He routinely obtained and used advice from accountants and lawyers. He personally invested in real estate that appreciated considerably in value. He bought waterfront property in Connecticut that multiplied in value, and he bought 90 acres on Shelburne Point in Vermont for $300,000 that ultimately yielded $12 million, from which he gave each of his children $1 million, separate and apart from the trusts. He invested in a real estate development in Taft Corners that has been profitable. He also held positions of financial responsibility in organizations. He was a Trustee of Middlebury College for 15 years, during which time he was Chair of the Endowment Committee and assets went from $12 million to $1.5 billion. He was a Trustee of Shelburne Farms for 35 years.

He is now 96 years old, but does not present with any diminished capacity. He testified extensively on both direct and cross examination, including as a hostile witness, on three separate days. He spoke with clarity and in detail about the facts and financial history of numerous trusts, assets, investments, trust provisions, the reasons for investment decisions that he made over the years, tax consequences related to investment properties, and the extent to which goals were realized or not from different investments made. The court finds that his testimony was credible and reliable.

In 1986, when the Co-Trustees were Willard and Joe Pokart, Trusts 1-4 purchased for $1.7 million a tract of 840 acres of land with one mile of frontage on the California coast that included a cattle ranch, timberland, a rock quarry, and an old farmhouse. Willard believed that the price was reasonable and that it would be a good investment as it would appreciate in value. Privately owned land on the California coast was rare as most of the oceanfront was owned by the State of California. It was purchased as an investment asset, and Petitioners do not dispute that the purchase of this land was a good investment. A corporation entitled "Jackson-Grube Family Inc." was formed to own the land. Each of the four trusts acquired 25% of the shares of the corporation. The same year Willard as an individual purchased and renovated a separate nearby property as a personal second home, which he named Sea Drum.

Following the purchase of the California land, over the years the Co-Trustees enlarged the property by purchasing seven adjacent parcels that became available. As a result of these purchases, the site now consists of 2,050 acres with 1 ½ miles of ocean frontage. It includes 1000 acres of range land on which there is an operating cattle ranch, 1000 acres of timber land consisting mostly of a redwood forest purchased in part from previously operating timber

4

companies, and an income producing rock quarry. It also now includes an Inn as described below. [2]

Also in 1986 when the California land was purchased, the Co-Trustees pooled all the Jackson-Grube investments together, including investments in trusts other than Trusts 1-4, which afforded the ability to take advantage of investment opportunities with mandatory minimum amounts that would yield higher returns than were available if the assets in each trust were handled separately. One such investment yielded an 11% return. By 1992, the value of the combined assets in trusts established by Willard's father had grown to $52 million. In 1998, a Delaware limited partnership, "The Jackson Grube Limited Partnership," was formed to hold the pooled assets, which then consisted mostly of stocks and fixed income securities. Each of Trusts 1-4 hold a percentage interest in the Limited Partnership, as do other trusts that were established by William and were managed by Willard.

Every year Willard, together with his Co-Trustee Joe Pokart, presided over an annual Family Meeting to review with his children and the Grube children the status of all of the investments in the trusts. He was assisted at every meeting by Howard Londner, a CPA who has worked with the Jackson-Grube trusts and investments since the 1970s. Mr. Londner had begun by preparing tax returns, but in the 1990s became more active in preparing reports and participating in annual family meetings to inform family members as beneficiaries about the activities in the trusts. Although he retired from active CPA work in 2015, he has continued to act as the liaison between the accounting firm and the family members and prepares quarterly reports of analysis of the holdings. He was always available to family members to respond to their questions about the investments and issues concerning the trusts.

Willard and Mr. Londner arranged for presentations by financial advisors, money managers, and accountants at annual family meetings to keep the remainder beneficiaries informed of the performance of all investments and future plans. The meetings lasted most of a day. Minutes were kept and distributed to the beneficiaries following the meetings.

Over time, Willard found that both his children and the Grube children were not particularly interested in the specifics of investment strategy or performance. The principal of the remainder interest they would receive in the future was growing in value due to the emphasis on growth rather than income. In the meantime, he individually and the children were receiving returns on assets outside of the trusts.

At the 1998 Family Meeting, Joseph Pokart retired as Co-Trustee of Trusts 1-4 after giving a review of the status of all of the trusts. At that time the California property still had only one mile of oceanfront and 1500 acres. The Minutes include the following: "We are in the process of getting a permit to build an inn. Our case has been appealed three times but it looks

---

[2] An eighth additional parcel became available at some point. After Petitioner Jeffrey Jackson objected to the trusts purchasing it, Willard and the Grube children purchased it under separate ownership, but it is contiguous to the site.

like it will be approved in another year or two. The cost of the inn is estimated at over $1 million. The ranch is expected to appreciate in value over the years." Exhibit 15, page 4.

Willard pursued the permit process, and within a couple of years had concluded, based on the advice of lawyers and accountants, that it was better not to renovate the existing farmhouse but rather to build something new. It would not necessarily be designed to produce income, which was not needed, but could be a long term investment as well as a project of interest for the family. Other investments were increasing in value under the investment policy of promoting growth, and Willard as the income beneficiary did not need trust assets to produce income for his personal needs. The issue of planning for the California property was discussed at every subsequent family meeting.

The Minutes of the 2000 Family Meeting are 8 pages long and highly detailed about all the investments. There is a section on the California ranch. Willard reported that he believed its value at that time to be about $10 million. A building permit had been approved.

The Minutes of the 2001 meeting state that the value of the Jackson Grube Limited Partnership had grown to $65 million, with investment performance notably higher than the S & P 500. A permit to construct a 10 unit bed and breakfast on the California land was in place with no decision about when to build it.

The Minutes of the 2004 Family Meeting include, in addition to reports on other family investments, a report of what appears to be a lengthy discussion of possibilities for the California land. Petitioners Jeffrey and Anne were both present. Willard stated that the cost of the property to date was about $4.5 million (at that time 1500 acres although purchase of an additional parcel was then contemplated), and that estimated market value was $15 million. Architects presented three options for rebuilding the ranch house with estimated costs of construction ranging from $1,240,000 to $1,915,000. There would be additional costs for septic, landscaping, utility hookup, architectural fees, and furnishings. The Minutes include the following:

"Points of view and pros and cons expressed by Willard and family members included:
- Provides a place for a manager or caretaker to live
- Bedrooms are more desirable to renters than a bunkroom
- 40 years from now this will still be a world-class site
- This creates something, gives the place a purpose, others can enjoy, adds value
- Should do something with the property, create a family legacy
- Nice to stay on the coast instead of in town or in a hotel
- A lot of hotel and other development in Fort Bragg
- Family has the money
- Not worth the cost, we decided against this before
- Outside advisor said there would be no problem finding a quality manager"
Exhibit 18, page 4.

The Minutes also show that a group of four persons was organized to "meet with the architects, a prospective manager and an outside inn consultant . . .to further explore the options

6

and opportunity. . . and report their findings back to the group. Family members should all think about the options, the future of the property and what they would like to do with it. Once we have more information we will schedule another meeting to further our discussion." *Id.*

The Minutes of the 2005 Family Meeting show that Willard and Howard Londner made a presentation for consideration by Trust 1-4 remainder beneficiaries about the possibility of putting the land value into dynasty trusts created by each of the cousins. The value of the land was expected to continue to appreciate. Willard had obtained advice from lawyers and accountants that in the future when the land value had appreciated, there would likely be high inheritance taxes that might require the descendants to have to sell. The Minutes state: "A Dynasty Trust will eliminate inheritance taxes on the ranch for the cousins' heirs and their descendants forever and will assure that the ownership of the ranch stays within the family unless the heirs agree to sell it.. . .The Inn and other ranch buildings would continue to be owned by the four trusts and rent the land from the Dynasty Trusts. Everything may be revenue neutral." The plan was that the dynasty trusts could buy the land at a discounted rate of 35% of market value.  Rhode Island was one of the few states to recognize dynasty trusts. Chris Grube was a resident of Rhode Island and thus could become a co-trustee with Willard of dynasty trusts.

The 2005 Minutes further state:

"Issues to consider and/or resolve include:
- What if a cousin does not want to create a Dynasty Trust for the ranch?
- How to assure trustee actions reflect stockholder wishes?
- What percent agreement is needed to make decisions such as selling the ranch?
- How will trustees be determined for future generations?"

Exhibit 19, page 2.

Jeffrey and Anne were both present at the meeting. It was proposed that the cousins review sample agreements and meet with a lawyer. The Minutes also state the following regarding the California Ranch Plans: "The vision is to redevelop the inn as a site to host weddings, conferences, and other events." Three phases of construction were identified. Approval of permits was expected by mid-2006 at the earliest.

In 2006, Chris Grube became Co-Trustee of Trusts 2 and 4 with Willard. On June 30, 2006, Anne created a Dynasty Trust (Exhibit 3), and Jeffrey did so on August 10, 2006 (Exhibit 4). Their sister Susan and all four cousins also did so that year.[3]  The Minutes of the Family Meeting include the following with respect to the California Ranch: "The objective of the Inn is to give a purpose to the Ranch, foster family involvement now and for future generations, and generate some cash flow to at least offset expenses. Phase 1 of construction will include 3 units

---

[3] Willard also created his own Dynasty Trust with respect to his interest in the ninth parcel of California land that the Trusts had not bought so that it could be treated together with the lands in the Trusts.

to rent out as vacation homes. . .It would also include an activity space and conference room for events. Phase 2, if constructed, would include 4 or 6 additional units." Exhibit 20, page 2.

Thus at both the 2005 and 2006 Family Meetings, prior to any money spent to build an inn, the plan for the operation of the inn was reviewed with all beneficiaries, including that it would not be for the purpose of generating income, but was planned to at least cover expenses.

The creation and funding of the dynasty trusts were designed to deal with the projection that the value of the land would appreciate considerably. To implement the plan of avoidance of inheritance taxes on the intergenerational transfer of interest in the California land, Chris Grube and Willard as Co-Trustees of the Dynasty Trusts executed a Shareholders Agreement with the Jackson-Grube Family Inc. corporation for the transfer of shares to the Dynasty Trusts in exchange for promissory notes. Trusts 2 and 4 hold such notes. Willard provides all seven children the funds to pay the annual interest on the notes. Such interest does not come out of or reduce the principal value of the corpus of the trusts.

In executing the documents to implement this plan, all of the cousins gave up the opportunity to receive, upon the death of Willard, a distribution from the trusts in the form of shares in the Jackson-Grube Family Inc. corporation that owns the land. They did so for the purpose of passing that interest in land value on to their own children without the requirement to pay inheritance taxes in the future on the full amount of appreciated land value.

Jeffrey claims that he was "forced" to give away part of his inheritance. There is no evidence that Jeffrey or Anne were coerced into participating in the dynasty trust plan, or that it was done without their knowledge and consent. The Minutes of the 2005 meeting show recognition of the real possibility that any cousin might not want to put their future interest in the California land into a dynasty trust. All of the cousins had been given information about the proposal at the 2005 meeting and had many months to evaluate it and consult with their own advisors. Jeffrey and Anne now regret agreeing to the structure of the dynasty trusts holding the value of the land, but their execution of the documents reflects their written consent to both the creation of their dynasty trusts and the purchase by their dynasty trusts of the shares representing their future interest in the California land.

They claim that they have been deprived of "lost" asset value that they should have been able to receive upon Willard's death, but they themselves made the decision to place that value in the dynasty trusts they created for the benefit of their own children. Trusts 2 and 4 each hold promissory notes from the dynasty trusts. If and when the land is sold, the notes will be paid to Trusts 2 and 4 and Jeffrey and Anne will receive those funds but their share of the value of the land that is over and above the note amount will go to their heirs without the necessity of payment of inheritance tax. The cost of the transaction in the form of interest payable on their promissory notes has been borne by Willard from funds outside of the trusts.

At the time the dynasty trusts were created, no money had yet been spent to renovate or construct an inn. Shortly after the creation of the dynasty trusts, in 2006, Willard and Chris

Grube, as Co-Trustees of Trusts 1-4, created a California limited liability company (LLC) named the "Inn at Newport Ranch, LLC" and executed an Operating Agreement for purposes of management of the Inn. The Inn leased 30 acres of land from Jackson-Grube Family Inc., owner of the eight assembled land parcels, for purposes of the Inn. The Operating Agreement requires agreement of 75% of its members for the Inn to be sold.

Willard believed that there was consensus among the seven cousins to proceed to build an inn, and he assembled a team of architects and builders to work on it. The investments held in the Limited Partnership were performing well. The Inn project was not intended to generate income, but to be a family project that would be self-sustaining while in the meantime the land value was appreciating. The value of the other investments, which also continued to be growth investments, was apparently increasing.

Over the next few years, Willard spent considerable effort creating designs and obtaining the necessary permits that would comply with multiple additional requirements mandated by various State and local regulatory bodies. There were frustrations in how long the permitting processes were taking as permits were denied and had to be reworked. This resulted in increased expenses. The money for design, permitting, and construction came from assets in Trusts 1-4 and costs exceeded expectations. In addition, evolving plans for the inn called for first class quality construction. Willard took advantage of opportunities to incorporate special features such as wide redwood slabs and unusual rocks from the quarry.

By 2014, $8 million had been spent, and the total cost was expected to be $10 million. Co-Trustee Chris Grube deferred to Willard on the project, and Willard had the time and willingness to run it. Willard acknowledges that if he had known when the Inn project started how much it would ultimately cost to build, he probably would not have recommended proceeding with the scope of what was done, but that once it was begun, it did not make sense not to finish it. He acknowledges that he wanted an Inn that would be worthy of the spectacular site on which it sits. He also acknowledged, as reflected in the minutes of the 2014 meeting, that he originally 'thought he was building a Ford but built a Mercedes.'

By this time Jeffrey in particular was not supportive of the project, and felt that too much money was being spent. He was the most vocal in expressing dissatisfaction with the money spent on Inn construction. Also, he did not want to wind up with a minority interest in the Inn and be in partnership with his cousins in a business he did not support. In 2014, as a result of expressed dissatisfactions, an Inn Committee was established to include family members in ongoing decision-making. Anyone who wanted to participate could be a member. Its role was advisory. Jeffrey was initially the Chair, and held monthly meetings by telephone.

In 2015 the Inn was partially complete and opened. The Minutes for 2015 show that Jeffrey was opposed to any additional construction, which was put on hold pending realization of profits. In 2018 the Inn was voted one of the 20 best hotels in the world, and it is the subject of a television video program extolling the beauty of the site and fine craftsmanship of construction. However, operating expenses have not been covered by cash flow except for 2021. The operating

cost shortfalls have been covered by Willard and the Grubes out of funds they receive as income beneficiaries. Thus, to date the interests of remainder beneficiaries have not been compromised by the operating losses.

The Inn Committee did not work out very well. The Committee apparently wrote to contractors saying they would not be paid without Committee approval. This was beyond the advisory committee's authority and interfered with Willard's working relationships with contractors. The Inn Committee was ultimately abandoned.

Willard testified that he believes that the package of land and Inn will wind up being a "fantastic" investment in the long run because of the unique characteristics of the land and the quality of the Inn. This combination includes extensive private oceanfront, spectacular views, diverse property resource features (ranch, forest, quarry), eligibility for carbon offsets, and unique quality design of the Inn buildings. He acknowledges that it will take time for the value to catch up with the total amount spent of $16.5 million, but his opinion is that this will happen. Approximately $5 million of assets from each of Trusts 2 and 4 was used to fund development of the Inn. Although the occupancy rate has been disappointing, Willard believes that the prospects are favorable for breaking even in the next few years and continuing to do so in the future as the Inn becomes better known. Promising events are booked for late summer of 2024.

Interstate Highway 1 parallels the coastline running north/south and bisects the land. The coast is on the west and the ranchland and redwood forests are on the east. There is a site on the land east of the highway (not on the 30 acres leased to the Inn) with a good view that Willard believed would be appropriate for sale as a house site. He obtained and maintained permits and installed a septic system to ready the site for sale as a developable property. He spent approximately $50,000-100,000 of his own funds on these costs and has not sought nor been paid reimbursement. He testified credibly that these expenditures add value to the land and land/inn combination.

At some unknown point in time in the past, Jeffrey needed money and asked his father for financial help. Willard provided funds from the Jackson-Grube Limited Partnership in the form of a loan with interest payable at 6% per year. Similarly, at some point Anne asked her father for financial help, and the same occurred. Between the two of them, as of December of 2023, together they had borrowed a total of $4.8 million. Mr. Londner provided a letter each year with the amount borrowed and the interest charged. Although they were obligated to pay interest, in 2019 the Jackson family members who would have benefitted from that interest agreed to forego all interest payable retroactive to the beginning of each of those loans, and the Grube beneficiaries agreed to an interest rate reduction from 6% to 3%. Altogether, the amount of interest for which Jeffrey and Anne would have been liable if interest had not been forgiven is approximately $2.5 million.

Anne believes that the loan funds should have been given to her as an advancement on her remainder interest and not a loan, and claims that Howard Londner agrees. However, the

2019 letter from Mr. Londner contains a hindsight comparison of what was done and would have happened if an advancement had been given. It does not constitute an opinion that Willard violated his obligations as Trustee. In any event, there is no evidence that assets in Trusts 2 and 4 were misused in any way in connection with the manner in which Jeffrey and Anne borrowed money from the Limited Partnership. There was no impact at all on the assets in Trusts 2 and 4 from these transactions. Jeffrey and Anne had no right to an advancement against their remainder interest, and they benefitted from the loans made available to them from other assets and the forgiveness of interest.

The dynasty trusts owe interest to Jackson-Grube Family Inc. on the promissory notes given to purchase the shares in connection with the land asset. Willard pays that interest from his personal funds on behalf of his children in the annual amount of approximately $29,000 each. Jeffrey is worried about having to pay that when Willard dies. Jeffrey acknowledges that Willard gave him and each of the children, from Willard's personal investments, an asset that provides each of them with annual income of $170,000 per year. Again, this is unrelated to any activity in Trusts 2 and 4.

Jeffrey wants Willard removed as Trustee, dissolution of Trusts 2 and 4, and a requirement that Willard pay $5 million to each of Trusts 2 and 4 to restore what was spent on the Inn. He claims that he never consented to the construction of the Inn, but admits that he does not know whether consent was required or not. The evidence is that it was not. Jeffrey would prefer that the Trusts held assets that were separately managed rather than pooled. He believes that Willard 'has not been a careful steward of the assets,' but has used Trust assets for his own personal Inn project.[4] He believes that Willard was not honest with the family. Jeffrey believes that Willard intended to build a 'Mercedes' from the beginning; that he wanted something that people would recognize as Willard's creation, and that it was done as a vanity project using trust funds.

He questions whether Willard, given his age, should maintain assets in the Trusts that have potential long-term value that will ripen over time (as opposed to assets with current maximum potential value), and favors common stocks that can be immediately traded. Over the years he had disagreed about the advisability of long-term private equity investments that would not pay out for 10-15 years, and believed that the Trust should have invested only in stocks. He apparently believes that the Trust should be holding investments that would provide him with immediate liquidity and flexibility on his father's death. It is noted that at the time William established the Trusts, and for some time after his death, the Trusts held second mortgages, with the Trustees having specific power to buy the mortgaged property (Exhibits 1 and 2, Article Eighth (b).) These would not have provided the remainder beneficiaries with sole ownership of liquid assets upon Willard's death. They probably would have resulted in fractional interests to the remainder beneficiaries. The history of investments in the Trusts shows that equity

---

[4] He has no complaints about Willard's investments in common stocks or private investments.

investments have been common with a clear record of substantial growth in value. The benefit will pass to the remainder beneficiaries on Willard's death.

In general, the evidence shows that Jeffrey is not particularly knowledgeable about financial investments. He is focused on wanting to have liquid assets distributed to him at the time of Willard's death.

Anne testified that she is in agreement with Jeffrey and seeks the same outcome. She is a bookkeeper by profession. From 2015 to 2022 she was the bookkeeper for the Inn and spent considerable time at the Inn although sometimes she worked remotely from the Cayman Islands. After Jeffrey resigned as Chair of the Inn Committee, she became Chair. In 2017 she wrote a letter urging the family to come together and support the Inn project, but she has since joined Jeffrey in his positions on family finances. She believed that Chris Grube was going to support the position she and Jeffrey are taking, but he declined to join this lawsuit. Jeffrey and Anne have now brought a separate suit against him in Probate Court for breach of trust.

Jeffrey and Anne believe that Willard knew before the dynasty trusts were signed that he planned to use Trust funds to build a legacy to himself, and that promptly after the dynasty trusts were signed he raided the assets to build his dream. This is their interpretation of what his motive must have been, but the evidence does not support this belief on their part.

Willard believes that the Inn will break even on a cash flow basis within the next few years as the property becomes more known. He believes that the property will continue to become more valuable because of the scarcity of oceanfront land available for private ownership and the unique quality of the Inn. Pursuant to a conservation easement, the waterfront is non-buildable, but the consequence is high value for unobstructed waterfront views available on the eastern portion of the land, such as the site he has made ready for development. He represented that the non-Inn assets in the Trust are invested for appreciation and the tax consequences to beneficiaries will be at a favorable capital gains rate. He believes that Jeffrey and Anne do not have a good understanding of how investments work, including the effect of depreciation and taxation on the value of assets. The evidence supports this opinion.

While Jeffrey and Anne believe that Willard intended to create essentially a permanent monument to himself, Willard testified credibly that he believes that the land and Inn together will prove to be a good long term investment. He also testified credibly that he is not opposed to selling, and has discussed doing so with at least one potential buyer.

Petitioners have not shown an overall diminution in the value of trust assets administered by Willard since 2006, which seems to be the beginning of the period of complaint, nor have they shown that any principal assets have been diverted by him from the trusts to his personal ownership or expenditures.

In 1993, the value of the pooled family assets managed by Willard (of which Trusts 1-4 are a part) was $52 million, having risen from $20 million at the time of William's death. By the

end of 2022, the value was $122 million. $38,340 had been withdrawn, so the increase in value for which Willard was responsible was roughly $108 million over that 29 year period. Trusts 2 and 4 assets were a portion of this pool. The specific values attributable to those two trusts are unknown, but both trusts certainly experienced significant growth.

As of June of 2022, Trust 2 consisted of:

| | |
|---|---|
| 25% interest in Inn at Newport Ranch LLC | $3,543,022 |
| 13.411% interest in Jackson-Grube LP | 5,381,907 |
| Loans from Dynasty Trusts | 841,500 |
| | $9,766,429 |

Trust 4 consisted of:

| | |
|---|---|
| 25% interest in Inn at Newport Ranch LLC | $3,543,022 |
| 11.105% interest in Jackson-Grube LP | 4,456,496 |
| Loans from Dynasty Trusts | 841,500 |
| | $8,841,018 |

This indicates a value attributed to the Inn at Newport Ranch LLC of $14,072,189. The evidence is that this is book value and not market value, which was and is unknown.

In addition to these assets, Willard was responsible for creating the appreciated value of the land (over and above the loan amount) that the remainder beneficiaries dedicated to their dynasty trusts for the benefit of their heirs. This value is also unknown.

Two appraisals were obtained in recent years, but neither of them was introduced into evidence and the little information about them indicates that neither of them provides reliable evidence about either the value of the Inn component of the Trust holdings, or a combined value of the land holdings together with the Inn component. One was for $10 million, but Willard claims it is inaccurate as it excluded the value of timber and used an inland motel to derive building value rather than a true comparable. Another was for $27 million that apparently was based in part on inaccurate information about what the property included. Neither figure provides reliable value information. The court cannot determine what was included in each appraisal or whether appropriate methodology was accurately applied. They are not usable.

As noted above, Willard believes that the value of the Inn component of the Trust holdings will appreciate to be more than its cost of $16.5 million. Petitioners provided no evidence of value currently attributable to the Inn at Newport Ranch, and provided no evidence contrary to Willard's testimony that the Inn will likely begin to break even on a cash flow basis within a few years and will appreciate to a level that exceeds the funds spent on the cost of construction. The court finds that Willard's projection is reasonable given his long and successful career in making investments, including investments in real estate properties that are likely to appreciate over time. Petitioners provided no testimony of a person knowledgeable about real estate values and investments.

13

Overall, Petitioners have focused on two issues: (1) cost overrun for construction of the Inn and related current shortfalls in operating costs, and (2) creation of a complex structure that means that when they receive their distribution as remainder beneficiaries, they will have fractional minority interests in the pool of assets in the Jackson-Grube LP and the Inn LLC. They have not provided evidence of poor performance of the corpus of the Trusts under Willard's trusteeship. They complain primarily about the current status of one asset, albeit a significant one, that does not currently have a value equal to the cost of constructing and operating it.

They also complain that the establishment of the dynasty trusts means they no longer will have access to increased land value upon Willard's death, but the court has found that they voluntarily chose to participate in the creation and purpose of those trusts to pass that value to their own heirs and did so willingly without any coercion or wrongdoing on the part of the Trustee. They had sufficient time to obtain advice and consider their choices, including declining to participate.

There has been significant overall growth and appreciation in asset value for the benefit of all of William's grandchildren as remainder beneficiaries. Assets have been managed specifically for growth for their benefit. Willard did not invest to emphasize return of income for his own benefit, which he could have done. He has not used trust assets for personal expenditures. It is reasonable to expect that trust assets spent on construction costs are likely to be recouped in value appreciation over time. They were not spent for Willard's personal financial gain. The Petitioners attribute to Willard a motive of using trust assets to build a "trophy for himself" but the evidence does not support a finding that, despite his enthusiasm for the California project, he has invested trust assets for personal purposes or in derogation of his responsibility to preserve trust asset value for the benefit of the remainder beneficiaries. On the contrary, the overall performance of the corpus of the Trusts has been one of growth. There is no evidence that Willard spent a penny of trust funds for his personal benefit. He has, in fact, covered many expenses on behalf of the beneficiaries from his personal funds.

In Petitioners' Response filed July 12, 2024, they claim that the value of the corpus should have doubled every 10 years. They presented no expert testimony about the performance of the corpus of the trusts. Jeffrey testified that his own opinion is that assets should grow in value by 5% a year. This was not only not supported by reliable evidence, but there is no showing that it did not occur when all asset value appreciation is taken into account. Anne testified that she does not know the value of the trusts and has no opinion of value of the total of land value and Inn improvements. Her complaints are the amount spent on construction, the loss of land value to her because of the dynasty trust, and the prospect of a minority interest in the Inn upon Willard's death.

The fact that Willard loves the California site and pursued the project of creating something special on it does not mean that trust funds were misused. Given his background in responsible and successful investing, the court finds that as much as he was committed to the project, he would not have continued if he did not responsibly think that the value would appreciate and "catch up" to the cost in the long run, making it a sound investment. The court finds that he was exercising responsible judgment in the decisions that he made, and he had the

14

authority to do so under the trust instruments, including the authority to invest in assets yielding returns that may require a long term to be realized. He is also open to the prospect of selling, which is a further indication that he is clear headed about responsible financial management and not merely interested in creating a long-term monument to himself at the expense of beneficiaries. There is no reason to conclude that if his expectation that revenues will come to cover operating costs does not occur, or that if the value of the business does not catch up to cost, he will not pursue sale for the benefit of the remainder beneficiaries. Even if that occurs, the evidence suggests that the overall performance of trust assets for the remainder beneficiaries has been one of substantial growth.

With respect to the claim of dishonesty, it is noteworthy that it was Willard who organized annual Family Meetings in which independent advisors were present to describe and explain investments and plans over most of a day each year, and minutes were kept and distributed to memorialize the information. His duties as Trustee did not require providing that level of transparency. Plans for the California property evolved slowly over years. Jeffrey and Anne complain that no cost figures were presented, but there is no evidence that such information was required in the first place, or that it would not have been available if requested. The evidence does not support the claim that Willard dishonestly intended to spend trust funds for his own purposes without disclosing his "true" intentions to the remainder beneficiaries.


## CONCLUSIONS OF LAW

The trusts in this action were created in New York and for many years the Trustees resided in New York. The Co-Trustees now live in Vermont and Rhode Island, but the trusts pay taxes in New York and Respondent claims they are governed by New York law although his attorney confirmed on the record that he has no objection to Vermont exercising jurisdiction over the claims in this case. Thus the case is properly before this Vermont court. 14A V.S.A. § 202. However, the parties disagree as to whether New York or Vermont law governs Willard's conduct as trustee and the related issue of available remedies. Petitioners rely on Vermont law as governing the administration of the trusts, whereas Respondent claims that New York law applies.

Under Vermont law, "[t]he meaning and effect of the terms of a trust are determined by: (1) the law of the jurisdiction designated in the terms unless the designation of that jurisdiction's law is contrary to a strong public policy of the jurisdiction having the most significant relationship to the matter at issue; or (2) in the absence of a controlling designation in the terms of the trust, the law of the jurisdiction having the most significant relationship to the matter at issue." 14A V.S.A. § 107. The trusts specify that "this indenture and the trusts hereby created and all rights hereunder shall be construed and determined in accordance with the Laws of the State of New York." Exhibits 1 and 2, Article Fifteenth.

The court has analyzed Petitioners' claims under both Vermont and New York standards for administration of trusts. As described below, the outcome of this litigation is the same, regardless of whether the court applies Vermont or New York trust administration law to the facts and issues in this particular case.

Petitioners seek removal of Respondent as Trustee, termination of the trusts, and restitution to the trust of funds that they claim Respondent improvidently spent. Under the law in Vermont, which has adopted the Uniform Trust Code, the court may remove a trustee under the following circumstances:

> (1) the trustee is obviously unsuitable;
> (2) the trustee has committed a serious breach of trust;
> (3) lack of cooperation among cotrustees substantially impairs the administration of the trust;
> (4) because of unfitness, unwillingness, or persistent failure of the trustee to administer the trust effectively, the court determines that removal of the trustee best serves the interests of the beneficiaries;
> (5) there has been a substantial change of circumstances or removal is requested by all of the qualified beneficiaries, the Probate Division of the Superior Court finds that removal of the trustee best serves the interests of all of the beneficiaries and is not inconsistent with a material purpose of the trust, and a suitable cotrustee or successor trustee is available;
> (6) for any cause, if the interests of the trust estate require it.

14A V.S.A. § 706(b)(1)–(6). "A violation by a trustee of a duty the trustee owes to a beneficiary is a breach of trust." 14A V.S.A. § 1001(a). Remedies for breach of trust may include, as requested, removal of the trustee and an order to "compel the trustee to redress a breach of trust by paying money, restoring property, or other means." 14A V.S.A. § 1001(b)(3) and (7).

The court may approve a proposed termination of a trust under certain circumstances, including the consent of all beneficiaries if the court concludes that "continuance of the trust is not necessary to achieve any material purpose of the trust," or the court "is satisfied that: (1) if all of the beneficiaries had consented, the trust could have been modified or terminated under this section; and (2) the interests of a beneficiary who does not consent will be adequately protected." 14A V.S.A. § 411(b); (e)(1)–(2). The court may also terminate a trust "if, because of circumstances not anticipated by the settlor, modification or termination will further the purposes of the trust," or "continuation of the trust on its existing terms would be impracticable or wasteful or impair the trust's administration." 14A V.S.A. § 412(a)–(b).

Unlike Vermont, New York did not adopt the Uniform Trust Code, but the differences with regard to breach of trust and remedies are not material to the outcome of this action. Under New York law, "[a]n individual seeking removal [of a trustee] bears the burden of [establishing] that the trustee has violated or threatens to violate his or her trust or is otherwise unsuitable to execute the trust." *Massey-Hughes v. Massey*, 200 A.D.3d 1684, 1689 (NY App. Div., 4th Dept. 2021) (quoting *Matter of Joan Moran Trust*, 166 A.D.3d 1176, 1179 (NY App. Div, 3d Dept. 2018) (further citation omitted). "Removal of a trustee is a 'drastic action not to be undertaken absent a clear necessity." *Id*. (quoting *Matter of Rose BB.*, 243 A.D.2d 999, 1000 (NY App. Div., 3d Dept. 1997). "Although discord between the trustee and others involved with the trust, standing alone, is typically an insufficient basis for removal, such conflict may support removal if the conflict thwarts proper administration of the trust or otherwise subverts the purpose of the trust." *Matter of Serena W.*, 218 A.D.3d 597, 598 (NY App. Div., 2d Dept. 2023) (quotation and

citation omitted). With regard to termination under New York law, neither the parties nor the court have identified any New York case or statute that would provide for termination of the trusts under circumstances resembling those in this action. For example, New York allows a court to order termination when continuation of a trust has become economically impracticable, but the facts in this case do not even remotely support such a conclusion. See N.Y. EPTL § 7-1.19(a)(1)–(2).

Under Vermont law, "[a] trustee is a fiduciary who owes duties of loyalty, disclosure, impartiality, and prudence to the beneficiaries, 14A V.S.A. §§ 802–804, 813, the breach of which is actionable." *Est. of Alden v. Dee*, 2011 VT 64, ¶ 17, 190 Vt. 401. A trustee must "administer the trust in good faith in accordance with its terms and purposes and the interests of the beneficiaries and in accordance with this title." 14A V.S.A. § 801. "A trustee shall administer the trust solely in the interests of the beneficiaries" and "shall act impartially in administering the trust, giving due regard to the beneficiaries' respective interests." 14A V.S.A. §§ 802(a) and 803. "A trustee shall administer the trust as a prudent person would, by considering the purposes, terms, distributional requirements, and other circumstances of the trust. In satisfying this standard, the trustee shall exercise reasonable care, skill, and caution." 14A V.S.A. § 804. The trustee must also "take reasonable steps to take control of and protect the trust property," and must keep the trust's property separate from his own property. 14A V.S.A. §§ 809 & 810. "Notwithstanding the breadth of discretion granted to a trustee in the terms of the trust, including the use of such terms as "absolute," "sole," or "uncontrolled," the trustee shall exercise a discretionary power in good faith and in accordance with the terms and purposes of the trust and the interests of the beneficiaries." 14A V.S.A. § 814(a).

Under New York law, "[a] trustee generally has a duty of undivided loyalty to the beneficiaries of a trust." *In re Lloyd's Am. Tr. Fund Litig.*, 954 F. Supp. 656, 679 (S.D.N.Y. 1997) (citing *City Bank Farmers Tr. Co. v. Cannon*, 51 N.E.2d 674, 675 (NY 1943)) (additional citation omitted). Where there are multiple beneficiaries, the trustee has a duty to deal impartially with them. *Matter of Ellen C. Stark Charitable Tr.*, 223 A.D.3d 951, 954 (NY App. Div., 3d Dept. 2024). "[E]ven when the trust instrument vests the trustee with broad discretion to make decisions regarding the distribution of trust funds, a trustee is still required to act reasonably and in good faith in attempting to carry out the terms of the trust." *In re Est. of Wallens*, 877 N.E.2d 960, 962–63 (NY 2007).

Both Vermont and New York have adopted a version of the Uniform Prudent Investor Act. 14A V.S.A. § 901 *et seq.*; N.Y. EPTL § 11-2.3. Except as modified by the provisions of a trust, "a trustee who invests and manages trust assets owes a duty to the beneficiaries of the trust to comply with the prudent investor rule set forth in this chapter." 14A V.S.A. § 901(a); see N.Y. EPTL § 11-2.3(a) ("A trustee has a duty to invest and manage property held in a fiduciary capacity in accordance with the prudent investor standard defined by this section, except as otherwise provided by the express terms and provisions of a governing instrument within the limitations set forth by section 11-1.7 of this chapter."). Vermont's statute articulates the standard as follows:

> (a) A trustee shall invest and manage trust assets as a prudent investor would, by considering the purposes, terms, distribution requirements, and other circumstances of the trust. In satisfying this

17

standard, the trustee shall exercise reasonable care, skill, and caution.

(b) A trustee's investment and management decisions respecting individual assets must be evaluated not in isolation but in the context of the trust portfolio as a whole and as a part of an overall investment strategy having risk and return objectives reasonably suited to the trust.

(c) Among circumstances that a trustee shall consider in investing and managing trust assets are such of the following as are relevant to the trust or its beneficiaries:

    (1) general economic conditions;

    (2) the possible effect of inflation or deflation;

    (3) the expected tax consequences of investment decisions or strategies;

    (4) the role that each investment or course of action plays within the overall trust portfolio, which may include financial assets, interests in closely held enterprises, tangible and intangible personal property, and real property;

    (5) the expected total return from income and the appreciation of capital;

    (6) other resources of the beneficiaries;

    (7) needs for liquidity, regularity of income, and preservation or appreciation of capital; and

    (8) an asset's special relationship or special value, if any, to the purposes of the trust or to one or more of the beneficiaries.

(d) A trustee shall make a reasonable effort to verify facts relevant to the investment and management of trust assets.

(e) A trustee may invest in any kind of property or type of investment consistent with the standards of this chapter.

14A V.S.A. § 902(a)–(e). "Compliance with the prudent investor rule is determined in light of the facts and circumstances existing at the time of a trustee's decision or action and not by hindsight." 14A V.S.A. § 905.

New York's statute provides as follows:

(1) The prudent investor rule requires a standard of conduct, not outcome or performance. Compliance with the prudent investor rule is determined in light of facts and circumstances prevailing at the time of the decision or action of a trustee. A trustee is not liable to a beneficiary to the extent that the trustee acted in substantial compliance with the prudent investor standard or in reasonable reliance on the express terms and provisions of the governing instrument.

(2) A trustee shall exercise reasonable care, skill and caution to make and implement investment and management decisions as a

prudent investor would for the entire portfolio, taking into account the purposes and terms and provisions of the governing instrument.

(3) The prudent investor standard requires a trustee:

(A) to pursue an overall investment strategy to enable the trustee to make appropriate present and future distributions to or for the benefit of the beneficiaries under the governing instrument, in accordance with risk and return objectives reasonably suited to the entire portfolio;

(B) to consider, to the extent relevant to the decision or action, the size of the portfolio, the nature and estimated duration of the fiduciary relationship, the liquidity and distribution requirements of the governing instrument, general economic conditions, the possible effect of inflation or deflation, the expected tax consequences of investment decisions or strategies and of distributions of income and principal, the role that each investment or course of action plays within the overall portfolio, the expected total return of the portfolio (including both income and appreciation of capital), and the needs of beneficiaries (to the extent reasonably known to the trustee) for present and future distributions authorized or required by the governing instrument;

(C) to diversify assets unless the trustee reasonably determines that it is in the interests of the beneficiaries not to diversify, taking into account the purposes and terms and provisions of the governing instrument; and

(D) within a reasonable time after the creation of the fiduciary relationship, to determine whether to retain or dispose of initial assets.

(4) The prudent investor standard authorizes a trustee:

(A) to invest in any type of investment consistent with the requirements of this paragraph, since no particular investment is inherently prudent or imprudent for purposes of the prudent investor standard;

(B) to consider related trusts, the income and resources of beneficiaries to the extent reasonably known to the trustee, and also an asset's special relationship or value to some or all of the beneficiaries if consistent with the trustee's duty of impartiality;

(C) to delegate investment and management functions if consistent with the duty to exercise skill, including special investment skills; and

(D) to incur costs only to the extent they are appropriate and reasonable in relation to the purposes of the governing instrument, the assets held by the trustee and the skills of the trustee.

N.Y. EPTL § 11-2.3(b)(1)–(4).

Petitioners argue that Willard's investment in the Inn breached his duties as trustee because the sole purpose of the Inn was to create a project for the family that would never generate a return on the investment; that furthermore he mismanaged the project, and that he pursued the project out of vanity rather than with regard for the interests of the beneficiaries. Petitioners contend that it was a further breach of duty to make Trusts 2 and 4 minority members of the Inn LLC because, when the Trusts terminate, Petitioners will become minority members who will "be obligated to subsidize the ongoing losses of the Inn." Petitioners' Proposed Findings of Fact and Conclusions of Law at 19–20.

According to Petitioners, Willard also breached his duties by transferring a portion of the value of the land from Trusts 2 and 4 to the dynasty trusts in exchange for promissory notes that will not be paid unless the dynasty trusts sell the land, and by establishing and managing the California assets "to further [his] vision […] and not the beneficiaries of the Trusts." Finally, they argue that by investing assets in the limited partnership, Willard breached his duty by commingling trust assets such that Petitioners will become limited partners in an investment partnership, and it will become difficult to withdraw from the limited partnership when Willard dies.

The facts contradict Petitioners' depiction of Willard's management of the trust assets in general and the California land and Inn projects in particular. As found above, Willard brought his considerable and successful experience with investment to bear on his decisions in investing the assets of Trusts 2 and 4, including investment in the California land and later the Inn.

As to the concern of commingling trust assets with those of other trusts, there is no evidence that accounting has not been done properly to maintain the integrity of each Trust's assets. Exhibits show that trust financial documents have been prepared by professionals and are precise about the fractional interest holdings of each Trust (see figures on page 13 above) reflecting careful accounting as to the specific holdings of each trust. See also the Fourteenth paragraph of the Trusts, quoted on page 3 above. The purpose of the Limited Partnership was to benefit from enhanced investment opportunities, which the court finds to have been successful when viewed as a whole, and the accounting has been done in a manner that protects the asset value interest of each trust. Petitioners express concerns that in the future they will acquire a minority interest, but as to the Limited Partnership, there is no evidence that the investments held by it cannot be distributed according to percentage interests with accuracy and integrity.

As to the possibility of distribution of minority interests in the Inn at Newport Ranch LLC, it is premature to conclude that distributions of minority interests is inevitable because sale of the entity could occur during Willard's life, but more importantly, Petitioners have provided no law that precludes distribution to a remainder beneficiary of a minority interest in an LLC. Moreover, as noted in the findings, had Willard died when the trusts held second mortgages and/or property purchased based on second mortgages, which was authorized, remainder beneficiaries would most likely have acquired minority interests in business properties. In addition, had the California land not been developed at all but continued to appreciate and there had been no dynasty trusts, upon Willard's death each of the seven cousins would have had a minority interest in the Jackson-Grube Family Inc. corporation that owned the land. Petitioners have produced no legal authority for the proposition that distribution of a minority interest in an asset constitutes a violation of a trustee's duty to remainder beneficiaries.

20

Regarding the fact that currently the Inn does not generate revenue, nor was it designed for the purpose of producing income, its value is part of the entire real estate package that includes the land as well as the Inn, and the package as a whole is reasonably expected to appreciate in value to the benefit of the trusts and ultimately, the beneficiaries and their heirs. Investment portfolios can be made up of both assets designed for income and others designed for growth. The California assets, including the land and Inn, fall into the growth category. The fact that they were designed for growth, which primarily benefits the remainder beneficiaries, does not show a violation of the trustee's duty to the remainder beneficiaries. The facts support the conclusion that the investments complied with Willard's duties under Vermont as well as New York law.

As to the creation of the dynasty trusts and exchange of shares for promissory notes at discounted value, there was no coercion, and Petitioners had ample time and opportunity to consider their decision to participate and to seek advice. They consented in writing through their execution of the necessary documents. Contrary to their assertion that value was lost, they have voluntarily passed the value to their heirs to avoid the possibility of high inheritance taxation that would otherwise fall on their heirs.[5]

The overrun in construction costs at the Inn does not, by itself, show mishandling of funds. Petitioners have failed to show that the combined value of the land and the Inn is less than reasonable in light of the investment. Nor does evidence support the theory that vanity was the driving motivation for the project, or that Willard acted in any manner other than in good faith while administering the trusts' assets. Willard has a long history of responsible money management and continues to consider the possibility of selling the California property versus holding onto it for expected appreciation and coverage of operating costs.

Under both Vermont and New York law, an evaluation of Willard's duty as prudent investor involves consideration of the entire portfolio, not just an isolated investment that by itself does not provide a high rate of return. The evidence suggests that the total value of the California property may now or in the future exceed the amount invested in it. Although there is insufficient evidence to determine this one way or the other, Petitioners have not proved violation of the prudent investor rule as to this asset. Moreover, Vermont law, on which Petitioners rely, is specific that "A trustee's investment and management decisions respecting individual assets must be evaluated not in isolation but in the context of the trust portfolio as a whole and as part of an overall investment strategy having risk and return objections reasonably suited to the trust." 14A V.S.A. § 902(b). The court concludes that Willard has managed trust assets in a way that has and continues to generate growth overall and amply provides for its beneficiaries' interests. Petitioners have not met their burden to show otherwise.

---

[5] Moreover, the transfers to the dynasty trusts occurred in 2006, and this suit was not commenced in the Probate Division until 2021. Thus, in addition to failure of proof, the Vermont Supreme Court case of *Est. of Alden v. Dee* suggests that the statute of limitations precludes claims based on the 2006 transfer of interests to the dynasty trusts.

Based on the findings above, the court concludes that Petitioners have not proved that Willard breached any duty as trustee under either Vermont or New York law. Petitioners have also not proved that any condition exists under the law of either state under which the court should remove Willard as trustee, order him to repay funds to the trusts, or terminate the trusts. Because such proof has not been made, it is unnecessary for the court to consider whether the requested remedies could even occur without the CoTrustee Chris Grube being included in the case as a Respondent. (This issue was not raised by either party.)

**Attorney fees**

Question 2 of Appellant's Statement of Questions for appeal filed by Respondent Willard Jackson on January 26, 2023 in the Probate Division, stated: "Is either party entitled to attorney fees and costs under 14A V.S.A. § 1004?"

If Respondent seeks attorney fees, he shall file a request by August 23, 2024, supported by time and billing records, together with a memorandum of law providing support for the request. If filed, Petitioners shall have 14 days to file a response.

## SUMMARY AND ORDER

Based on the Findings of Fact and Conclusions of Law set forth above, Petitioners have not proved their claims and judgment shall be entered for Respondent upon resolution of any claim for attorney fees, which must be filed by August 23, 2024 as set forth above.

Electronically signed July 31, 2024 pursuant to V.R.E.F. 9 (d).

Mary Miles Teachout

Mary Miles Teachout
Superior Judge (Ret.), Specially Assigned

22